Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued March 14, 2003        Decided June 10, 2003

No. 02-1020

RAINBOW/PUSH COALITION,
APPELLANT

v.

FEDERAL COMMUNICATIONS COMMISSION,
APPELLEE

SINCLAIR BROADCAST GROUP, INC., ET AL.,
INTERVENORS

———

Appeal of an Order of the
Federal Communications Commission

———

*David P. Huitema* argued the cause for appellant. With him on the briefs were *Michael S. Giannotto* and *David E. Honig.*

*C. Grey Pash, Jr.*, Counsel, Federal Communications Commission, argued the cause for appellee. With him on the brief

———

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

were *Jane E. Mago*, General Counsel, and *Daniel M. Armstrong*, Associate General Counsel.

*Kathryn R. Schmeltzer* argued the cause for intervenor. With her on the brief were *Barry H. Gottfried* and *Howard A. Topel*.

Before: GINSBURG, *Chief Judge*, and EDWARDS and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* GINSBURG.

GINSBURG, *Chief Judge*: Rainbow/PUSH Coalition petitioned the Federal Communications Commission to deny certain applications to transfer control of television broadcasting licenses. The Commission, having determined that some of Rainbow's objections relating to the licensees' prior dealings had merit, imposed forfeitures upon the licensees but nevertheless granted their applications without holding a hearing. We hold that Rainbow lacks standing to appeal that decision.

## I. Background

The Communications Act of 1934 prohibits the assignment or transfer of a broadcast license without the approval of the Commission. 47 U.S.C. § 310(d). In 1998 Sullivan Broadcast Holdings, Inc. applied for approval to sell five television stations to Sinclair and to sell five others, including KOKH–TV in Oklahoma City, Oklahoma, to Glencairn. *See Edwin L. Edwards, Sr.*, 16 F.C.C. Rcd. 22236, ¶ 2 & n.1 (2001). As the consideration for its acquisition Glencairn agreed to assume certain of Sullivan's debts. *Id.* ¶ 8.

At the time these applications were filed the Commission's so-called "duopoly" rule prohibited the common control of more than one television license in a market. In August 1999, while the applications were pending, the Commission revised its broadcast multiple ownership rules, loosening the "duopoly" rule to "allow common ownership of two stations in the same [market] if . . . eight independently owned, full-power and operational television stations . . . will remain post-merger." *Review of the Comm'n's Regulations Governing Television Broad.*, 14 F.C.C. Rcd. 12903, ¶ 8 (1999) ("*Re-*

*vised Television Rules*"), *reconsid. denied in relevant part*, 16 F.C.C. Rcd. 1067, ¶ ¶ 7–24 (2000), *remanded in relevant part sub nom. Sinclair Broad. Group v. FCC*, 284 F.3d 148, 158–65 (D.C. Cir.), *further rulemaking proposed at 2002 Biennial Regulatory Review*, 17 F.C.C. Rcd. 18503, ¶ ¶ 18–19, 76–77 (2002).

In November 1999 Sullivan, Sinclair, and Glencairn substantially restructured their proposed transaction and filed revised applications with the Commission. First, Sullivan applied to transfer KOKH to Sinclair rather than to Glencairn. Second, Glencairn applied to transfer to Sinclair five other television stations, including KRRT–TV in Kerrville, Texas, near San Antonio. *Edwards* ¶ ¶ 3–4. In consideration Glencairn was to receive approximately $8 million in Sinclair stock. *Id.* ¶ 12. Third, Glencairn sought Commission approval to transfer control of the corporation from Edwin L. Edwards to Carolyn Smith. *Id.* ¶ 3.

Claiming an interest in the matter because one of its members lived in Oklahoma City and another in San Antonio, Rainbow filed petitions to deny both the original and the revised applications. Rainbow alleged that Sinclair was in *de facto* control of Glencairn – and therefore already controlled Glencairn's stations – in violation of the approval requirement of § 310(d). Based upon this alleged fact, Rainbow objected to the original deal on the ground that it would violate the pre–1999 duopoly rule because both Sinclair and Glencairn would own stations in Oklahoma City. That objection appears to have been mooted by the revision of the duopoly rule. Rainbow also alleged that Glencairn had overstated the amount of debt it intended to assume as consideration for the purchase of stations from Sullivan. *Id.* ¶ ¶ 8–9. Rainbow asked the Commission first to deny the applications outright or, alternatively, to hold a hearing, which the Commission must do if there is "a substantial and material question of fact" as to whether granting an application would be in the public interest. 47 U.S.C. § 309(d)(2).

The Commission determined that for purposes of the transactions at issue Sinclair was, as alleged, in *de facto* control of

Glencairn, and therefore in violation of § 310(d). *Edwards*, 16 F.C.C. Rcd. 22236, ¶ ¶ 23–28. For this it fined Sinclair and Glencairn $40,000 each. *Id.* ¶ 29. The agency nonetheless granted their applications without a hearing, conditioned upon certain changes, not relevant here, in the agreements. Noting that the parties had cooperated in its investigation and "manifested no palpable intent to deceive the Commission," the Commission found nothing in the record to suggest that the broadcasters' violation "raise[d] questions about the character qualification of these parties to be licensees." *Id.* ¶ 21. Although they had been parties to an unauthorized transfer of control, whereby Sinclair assumed *de facto* control of Glencairn, their "actions appear[ed] to reflect reliance on past [Commission] staff decisions involving similar facts, and thus appear[ed] to be miscalculations . . . as to what was permissible." *Id.* Moreover, Edwards' impending departure from Glencairn would "mitigat[e] the potential for future lapses." *Id.* With regard to the alleged financial misrepresentation, which the Commission characterized as a mere "misstatement" and a "mistake," the Commission concluded there was no substantial and material question of fact and therefore no need for a hearing. *Id.* ¶ 28.

## II. Analysis

On appeal Rainbow claims the Commission's failure either to deny the licensees' applications or to hold a hearing on its allegations was arbitrary and capricious. We cannot reach the merits of Rainbow's claim, however, because, as the Commission argues, the appellant lacks standing to appeal, wherefore we lack jurisdiction over its case. *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002).

An association, such as Rainbow, has standing to sue under Article III of the Constitution of the United States only if (1) at least one of its members would have standing to sue in his own right; (2) the interest it seeks to protect is germane to its purpose; and (3) neither the claim asserted nor the relief requested requires the member to participate in the lawsuit. *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S.

333, 343 (1977). Because Rainbow has not demonstrated that it meets the first requirement, we need not consider the others.

The "irreducible constitutional minimum of standing contains three elements": (1) injury-in-fact, (2) causation, and (3) redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). The injury must be both "concrete and particularized" and "actual or imminent." *Id.* at 560. The burden on a party challenging an administrative decision in the court of appeals is "to show a substantial probability that it has been injured, that the defendant caused its injury, and that the court could redress that injury." *Sierra Club*, 292 F.3d at 899. This burden is "the same as that of a plaintiff moving for summary judgment in the district court," in that the party must produce actual evidence, not mere allegations, of facts that support its standing. *Id.*

Rainbow seems to argue that our cases establish a *per se* rule that a person has standing to protect the "public interest" by challenging any decision of the Commission regulating (or, as in this case, declining to regulate) a broadcaster in whose listening or viewing area the person lives. Thus, we are told (in the appellant's reply brief) with respect to the first two elements of standing, "When the FCC permits the transfer of a license to a party that will not operate in the public interest, the FCC causes injury to the station's audience sufficient to create standing." If there were no more to standing than that, however, then the "irreducible constitutional minimum" would be irreducible only because it could not be any smaller and still be said to exist.

As authority for automatic audience standing, Rainbow relies upon *Office of Communication of United Church of Christ v. FCC*, 359 F.2d 994 (D.C. Cir. 1966) (*UCC*). The appellants there had petitioned to intervene in opposition to a broadcaster's application to renew its license, alleging that its station "did not give a fair and balanced presentation of controversial issues, especially those concerning Negroes." *Id.* at 998. In deciding that at least some of the appellants

had standing to appear before the Commission,* we rejected the Commission's arguments that "the only types of effects sufficient to support standing are economic injury and electrical interference," and that "members of the listening public do not suffer any injury peculiar to them" and therefore lack standing. *Id.* at 1000. Rather, we recognized that "standing is accorded to persons not for the protection of their private interest but only to vindicate the public interest." *Id.* at 1001. In light of the Commission's acknowledgment that it "cannot begin to monitor or oversee the performance of every one of thousands of licensees," *id.* at 1003, we found "no reason to exclude those with such an obvious and acute concern as the listening audience." *Id.* at 1002. We therefore remanded the matter to the Commission with instructions to "allow standing to one or more of [the appellants] as responsible representatives" of the audience. *Id.* at 1006.

Thus in *UCC* did we establish that audience members may have standing to challenge a decision of the Commission because they may bring to the Commission's attention matters relating to a broadcaster's programming. We did not, however, purport to apply a more relaxed standard to audience members than to other litigants seeking to demonstrate their standing under Article III. It was perfectly clear in

---

* The precise issue before the court in *UCC* was whether certain members of the audience had standing to appear before the Commission under § 309(d) of the Communications Act. The court assumed, however, that "the same standards are applicable to determining standing before the Commission and standing to appeal a Commission order to this court," and therefore "used the cases dealing with standing in the two tribunals interchangeably." 359 F.2d at 1000 n.8. We assume, for purposes of this appeal, that the court's views on standing were applicable not only to standing under the Act but also to constitutional standing. *But see Envirocare, Inc. v. NRC*, 194 F.3d 72, 74 (D.C. Cir. 1999) ("Agencies, of course, are not constrained by Article III of the Constitution; nor are they governed by judicially-created standing doctrines restricting access to the federal courts. The criteria for establishing 'administrative standing' therefore may permissibly be less demanding than the criteria for 'judicial standing' ").

*UCC* that the appellants would be injured, and substantially so, by the Commission's grant of the renewal license. The appellants had complained that "Negro individuals and institutions are given very much less television exposure than others are given and that programs are generally disrespectful toward Negroes." *Id.* at 998 n.4. This allegation was "particularized and accompanied by a detailed presentation of the results of Appellants' monitoring of a typical week's programming." *Id.* As the Commission's order noted, similar complaints had been made to the broadcaster for ten years, *id.* at 997–98, indicating that if the Commission renewed the broadcaster's license, the licensee could be expected to continue programming in the same vein. In short, the appellants' proffer demonstrated that the Commission's renewal of the license would adversely affect them.

Rainbow has not made a comparable showing; indeed, it has not even tried to do so. In its initial brief Rainbow stated broadly that it "is an organization committed to furthering social, racial, and economic justice" and that it "seeks to ensure that professional opportunities in broadcasting expand for minorities and that communities have access to diverse broadcasting sources." Rainbow also stated that "[s]everal" of its members "live and watch television in the markets that are at issue in this appeal." Although Rainbow did not so indicate in its brief, *cf. Sierra Club*, 292 F.3d at 900–01 ("the petitioner may carry its burden of production by citing any record evidence relevant to its claim of standing"), that claim is apparently supported to the extent of two declarations in the record compiled before the agency. In each the declarant alleges she is a Rainbow member and a "regular viewer" of either KOKH or KRRT. Each declarant also alleges that if the relevant application were granted, then "members of Rainbow/PUSH, including myself, would be deprived of job opportunities and program service in the public interest."

These statements do not establish the declarants' standing. They merely identify rather than document two potential types of injury: loss of "job opportunities" and deprivation of "program service in the public interest." Rainbow's briefs say nothing at all about job opportunities, and therefore

neither shall we. Rainbow's real claim of injury goes to the alleged deprivation of "program service in the public interest," but that claim is not sufficiently "concrete and particularized" to pass constitutional muster.

Rainbow is challenging the Commission's decision not to hold a hearing in order to determine (1) whether Sinclair's *de facto* control of Glencairn was so indicative of untrustworthiness that a harsher sanction than a fine was required, and (2) whether Edwards intentionally misrepresented facts to the Commission. Ultimately it seeks to have the Commission strip both Sinclair and Glencairn of all their licenses (the great majority of which are for communities where, so far as the record reveals, Rainbow has no members). It is unclear, however, just how the Commission's failure to do that causes harm to the appellants, that is, deprives its member-viewers even in Oklahoma City or San Antonio of "program service in the public interest." Indeed, Rainbow does not attempt to show that either Sinclair's illicit control of Glencairn's stations before the rule was changed in 1999 or Glencairn's alleged misrepresentation concerning the debt it would assume in the originally contemplated transaction had a direct effect upon the programming available to its member-viewers.

Instead Rainbow makes only broad and conclusory assertions – and even these come only in its reply brief – to the effect that "illicit control detracts from the public interest in diverse media ownership and access to as broad a range of programming content and viewpoints as possible"; "Sinclair's control of Glencairn has lowered the number and diversity of independent broadcasters to which Rainbow/PUSH members have access in each of the markets where both Sinclair and Glencairn have held licenses"; and "Sinclair's acquisition of the licenses would not serve the public interest because . . . Sinclair has demonstrated a propensity for violating agency rules." These statements do elaborate upon Rainbow's theories of injury but they do nothing to support them.

We understand Rainbow to present two theories. First, increased concentration in the ownership of broadcast stations results in fewer voices being heard and therefore in

decreased diversity in content; ergo, the public interest automatically suffers when two formerly independent stations come under common ownership. Second, the public interest suffers if a rule-breaker – especially a deceitful rule-breaker – is permitted to hold a license, because the Commission relies heavily upon a licensee's candor and honesty to administer the Communications Act in the public interest.

The first theory has an intuitive appeal, and indeed something very like it underpins the Commission's duopoly rule. *See Revised Television Rules*, 14 F.C.C. Rcd. 12903, ¶ 7. While it is reasonable for the Commission, however, to assume that a greater concentration of ownership may decrease the diversity of voices on the airwaves, and to erect a prophylactic regulation in order to avert that possibility, *see FCC v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775 (1978) (upholding Commission's regulation barring co-located newspaper-broadcast combinations based upon this reasoning), it does not follow that common control of two licenses in the same market necessarily or even probably affects their programming. Absent a showing that Sinclair's assumption of control of KOKH or KRRT resulted in some actual effect upon the programming of those or of the commonly controlled stations in their markets, Rainbow's fears of decreased diversity remain purely speculative.

Similarly, Rainbow's second theory suggests only that the Commission would be wise to enforce aggressively the requirement of candor in its proceedings, as a deterrent to potential violators. In that regard the Supreme Court has stated that the Commission may refuse to renew a license because of the licensee's misrepresentations, *FCC v. WOKO, Inc.*, 329 U.S. 223 (1946), and we have stated that the Commission "would be derelict if it did not hold broadcasters to high standards of punctilio, given the special status of licensees as trustees of a scarce public resource." *Leflore Broad. Co. v. FCC*, 636 F.2d 454, 461 (1980). It does not follow, however, that the audience is harmed whenever the Commission punishes a particular misrepresentation with less than the ultimate sanction. At any rate, Rainbow's bare allegations, unsupported by any evidence, obviously cannot

establish an "actual or imminent" effect upon programming sufficient to support a motion for summary judgment. *See Sierra Club*, 292 F.3d at 899.

Rainbow claims our decision in *Llerandi v. FCC*, 863 F.2d 79, 85 (1988), requires a different result. There we stated that the appellant's affidavit, asserting that he lived in the relevant market, "[of its own force] establishe[d] the requisite injury necessary to satisfy the strictures of Article III" because "[l]isteners are, by definition, injured when licenses are issued in contravention of the policies undergirding the duopoly rule." *Llerandi* is of no help to the appellant, however.

*Llerandi* was a case in which the petitioners were "invok[ing] and press[ing] the duopoly rule" itself, *id.* at 85, and thus seeking to take advantage of a prophylaxis the Commission had designed to protect listeners from the possibility that programming would be degraded by the creation of a duopoly. In light of the Commission's 1999 revision of the duopoly rule, petitioners cannot and do not allege that granting the applications at issue here would actually violate the current rule. Rather they make only the more general, and vague, claim that Sinclair's acquisition of the licenses "would reduce the diversity" of programming in San Antonio and Oklahoma City.

But the Commission's revision of its rule deprives this claim of any support that it might once have derived from the agency's expertise, and Rainbow offers nothing acceptable in its stead. In *Sierra Club*, we held that a petitioner cannot "rest on ... mere allegations, but must set forth by affidavit or other evidence specific facts" in support of its claim of injury. 292 F.3d at 899. Rainbow, however, has submitted nothing more than identical declarations from two of its members, asserting that each "would be seriously aggrieved" by a grant of the applications because "as a consequence ... members of Rainbow/PUSH, including myself, would be deprived of ... program service in the public interest." Those declarations are insufficient to satisfy the requirements of *Sierra Club*. They do not state why the declarants believe

that a grant of the applications would deprive them of "program service in the public interest." Indeed, they do not offer evidence that programming after a grant would be any different than it was before, or even "plausible predictions about [the] likely programming decisions" of the applicants. *Huddy v. FCC*, 236 F.3d 720, 722 (D.C. Cir. 2001).

Nor do the other cases Rainbow invokes support its standing here. In *Hale v. FCC*, 425 F.2d 556 (1970), we dismissed an intervenor's challenge to the appellants' standing without reporting what the appellants had alleged and with only a brief reference to *UCC*. *Id.* at 558 n.2. As we have said, however, nothing in *UCC* suggests or could be taken to mean that Rainbow can be excused from the ordinary requirements for demonstrating its standing under Article III. The same is true of our one-sentence rejection of the challenge to the standing of the appellant in *Joseph v. FCC*, 404 F.2d 207, 211 (1968) ("The allegations in the motion [for reconsideration] before the Commission demonstrated at least prima facie standing"), which sentence appears to be inconsistent with the requirement of actual evidence explicated in *Sierra Club*.

In short, Rainbow has failed to produce evidence that it (or one of its members) has suffered the injury-in-fact required for standing. We reject its argument that a member of a station's audience can establish her standing merely by alleging that if the Commission were to grant a particular license application then she "would be deprived of . . . program service in the public interest."

## III. Conclusion

For the foregoing reasons the appeal is

*Dismissed.*