Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued March 12, 2004          Decided July 27, 2004

No. 03-1068

VILLAGE OF BENSENVILLE, *ET AL.*,
PETITIONERS

v.

FEDERAL AVIATION ADMINISTRATION,
RESPONDENT

CITY OF CHICAGO,
INTERVENOR

———

On Petition for Review of an Order of the
Federal Aviation Administration

———

*David J. Cynamon* argued the cause for the petitioners. *Robert E. Cohn*, *J. E. Murdock III*, *Alexander Van der Bellen*, and *David C. Lashway* were on brief.

*Ara B. Gershengorn*, Attorney, United States Department of Justice, argued the cause for the respondent. *Peter D.*

———

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Keisler*, Assistant Attorney General, and *Barbara C. Biddle*, Assistant Director, United States Department of Justice, were on brief. *Jacob M. Lewis*, Attorney, United States Department of Justice, entered an appearance.

*Michael Schneiderman* argued the cause for the intervenor. *Thomas R. Devine* and *David T. Ralston, Jr.* were on brief. *Mary C. Jester* entered an appearance.

*Arthur P. Berg* and *Patricia A. Hahn* were on the brief for *amicus curiae*, Airports Council International – North America.

Before: EDWARDS and HENDERSON, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*:

[T]hat astonishing Chicago—a city where they are always rubbing the lamp, and fetching up the genii, and contriving and achieving new impossibilities. It is hopeless for the occasional visitor to try to keep up with Chicago—she outgrows his prophecies faster than he can make them.

> – MARK TWAIN, LIFE ON THE MISSISSIPPI 326 (Signet Classic 2001) (1883)

The City of Chicago (Chicago or City) has conceived a $6.6 billion program to modernize O'Hare International Airport, which consistently ranks as one of our nation's busiest and most delayed airports. To fund the initial component of the program—the preparation of an Environmental Impact Statement (EIS) regarding the modernization program—Chicago sought and received from the Federal Aviation Administration (FAA) approval to impose a $4.50 facility fee on passengers enplaning at O'Hare. Now three Chicago suburbs, the Villages of Bensenville and Elk Grove and the City of Park Ridge, petition for review of the FAA's decision, alleging that, in approving Chicago's application, it violated the Federal Aviation Act of 1958, 49 U.S.C. §§ 40101 *et seq.*, the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), the National

Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.*, and its own regulations. Because the FAA did not find, as required by statute, that Chicago's passenger facility fee will generate only that revenue necessary to fund the EIS, we grant the municipalities' petition and remand for the FAA's further consideration.

## I.

The FAA may authorize an "eligible agency," *i.e.*, a public agency controlling a commercial airport, *see* 49 U.S.C. § 40117(a)(2), to impose a "passenger facility fee" of from one to three dollars "on each paying passenger of an air carrier" to be used to finance "an eligible airport-related project," *id.* § 40117(b)(1). An "eligible airport-related project" includes "a project for airport development or airport planning." *Id.* § 40117(a)(3)(A). Once the FAA determines that an agency's passenger facility fee application is substantially complete, it must advise the public of its decision by letter and give notice in the Federal Register of its intent to rule on the application and invite public comment thereon. *See id.* § 40117(c)(3); 14 C.F.R. § 158.27(b)-(c). The FAA has 120 days after receiving the application to approve or deny it, in whole or in part. *See* 49 U.S.C § 40117(c)(4); 14 C.F.R. § 158.27(c)(4).

Before authorizing any passenger facility fee, however, the FAA must make three specific findings based on the application. *See* 49 U.S.C § 40117(d). The FAA must find that the proposed passenger facility fee will not generate excessive revenue, that is, revenue constituting "more than the amount necessary to finance the specific project." *Id.* § 40117(d)(1). Additionally, the FAA must find that the specific project is an eligible airport-related project that will maintain or improve the "capacity, safety, or security of the national air transportation system"; reduce airport noise; or improve conditions for competition "between or among air carriers and foreign air carriers." *Id.* § 40117(d)(2)(A)-(C). Finally, the FAA must find that the application includes an "adequate justification" for the specified project. *Id.* § 40117(d)(3).

The FAA may also authorize, under a different standard, a higher passenger facility fee of $4.00 or $4.50. *Id.* § 40117(b)(4). "[I]n the case of an airport that has more than .25 percent of the total number of annual boardings in the United States," the higher fee can be imposed if the FAA finds that the project "will make a significant contribution to improving air safety and security, increasing competition among air carriers, reducing current or anticipated congestion, or reducing the impact of aviation noise on people living near the airport."[1] *Id.* § 40117(b)(4)(A). The FAA approved Chicago's passenger facility fee challenged here under this statutory framework.

In October 2002, Chicago's Department of Aviation (Department) applied to the FAA for authority to impose and use a passenger facility fee of $4.50 to fund a "Runway Formulation Project," the initial component of the City's O'Hare modernization program. Joint Appendix (J.A.) 54, 69, 71–72. In its application, the Department explained that the modernization program would cost $6.6 billion and provide for the "phased reconfiguration of the airfield at O'Hare as well as corresponding expansions and reconfiguration of passenger terminals, access/circulation systems and necessary support facilities." J.A. 71. According to the Department, the "major functional components" of the program included the addition of a new runway, the relocation of three existing runways and the extension of two others. J.A. 71. The Department explained that the program also entailed "the construction of an airside concourse, a western terminal and access roads," acquisition of necessary land and measures to mitigate airport noise. J.A. 71.

As for the Runway Formulation Project itself, the Department explained that it involved the "[c]ompletion of all techni-

---

[1] The FAA must additionally find that "the project cannot be paid for from funds reasonably expected to be available for the programs referred to in [49 U.S.C. §] 48103," *id.* § 40117(b)(4)(B), which section specifies the amounts available from the Airport and Airway Trust Fund to make grants for airport planning, development and noise compatibility planning and programs. *See id.* § 48103.

cal, physical and operational planning, as well as environmental processing" needed for the modernization program, "with a particular focus on the impacts and requirements for" the first phase of the modernization program.[2] J.A. 71. The Department then explained in greater detail what the Runway Formulation Project entailed.

> This project . . . includes, but is not limited to, surveys of existing conditions, including soil borings and geotechnical analyses, utility surveys, environmental surveys, airport-wide drainage design, utility and other underground corridor definition, review and updating design standards, continued refinement of capital cost estimates, project scope definition and other studies as required for processing of the [EIS] for the entire airfield and major components of other aspects of the [modernization program].

J.A. 71–72. The Department initially estimated that the Runway Formulation Project would cost $200 million, but—in response to the FAA's concerns about the project's scope—later downsized the project and concomitantly lowered its estimated cost to $121 million.[3] *Compare* J.A. 254, *with* J.A. 75, 262, 265.

In support of its modernization program generally and its Runway Formulation Project specifically, the Department explained that O'Hare consistently ranks as one of the nation's busiest and most delayed airports. The modernization program addresses these conditions, the Department explained, because it "has been formulated to preserve and enhance the capacity of the national air transportation system." J.A. 72. The Department further stated that "[t]he

---

[2] The first phase of the modernization program, the Department explained, included the design and construction of "a new northernmost parallel runway," an extension of "Runway 10L" and "a new southern closely-spaced runway." J.A. 71.

[3] The Department also requested an amount equal to the revised cost estimate, that is, another $121 million, to cover bond financing and interest.

justification for this capital investment lies in the operational benefits (reduced delays and airfield capacity enhancement) that will result from the design and construction of the [modernization program]." J.A. 73. Turning to the subject of its application, *i.e.*, the Runway Formulation Project, the Department explained that it will "*preserve and enhance the capacity and safety* of the national air transportation system by providing for projects which reduce delays and congestion at O'Hare" and that "[t]he analysis to be performed through this project is necessary to support environmental processing." J.A. 72 (emphasis in original).

The FAA deemed Chicago's passenger facility fee application substantially complete on November 27, 2002. Accordingly, the FAA published notice in the Federal Register of its intent to rule on Chicago's application and invited public comment. *See Notice of Intent To Rule on Application 03– 15–C–00–ORD To Impose a Passenger Facility Charge (PFC) at Chicago O'Hare Int'l Airport & To Use the Revenue at Chicago O'Hare Int'l Airport, Chicago, IL & Gary/Chicago Airport, Gary, IN*, 67 Fed. Reg. 77,549, 77,550 (Dec. 18, 2002).

In February 2003, the FAA partially approved Chicago's application. *See Final Agency Decision, City of Chicago, Dep't of Aviation, Chicago, IL*, Feb. 28, 2003, *reprinted in* J.A. 353–78. In its order, the FAA authorized Chicago to impose and use a $4.50 passenger facility fee to fund a Runway Formulation Project with a total estimated cost of over $220 million, a sum intended to be divided equally between the cost of the EIS itself and associated financing and interest costs.[4] In doing so, the FAA explained that "[c]ongestion, capacity, and competition constraints at [O'Hare] have been noted in many studies and reports, most recent[ly] the FAA's 2001 Airport Capacity Benchmark Report" and that Chicago's modernization program

---

[4] The FAA reduced the passenger facility fee "bond capital and financing and interest amounts" in light of the City's intention to "utilize $10,178,850 in Fiscal Year 2003 [Airport Improvement Program] entitlement funds on this project." J.A. 361.

"has been formulated to address some of these concerns." J.A. 361. The FAA repeatedly noted, however, that the Runway Formulation Project entailed only the work "leading to the completion of an EIS," J.A. 360, for the modernization program, which also included the study of alternatives to the modernization program. *See, e.g.*, J.A. 360–61, 368–70. According to the FAA, the Runway Formulation Project "includes only that work involved in the completion of all technical, physical, and operational planning, as well as environmental processing, leading to the completion of an EIS for the entire airfield and other major components of the [modernization program]." J.A. 360. The FAA further stressed that its authorization of the passenger facility fee to fund the EIS did not "include any construction or land acquisition costs nor . . . any design work beyond what the FAA agrees is necessary to complete the EIS process." J.A. 361.

The municipalities now petition for review of the FAA's order approving Chicago's passenger facility fee. For the reasons set forth below, we grant their petition and remand the case to the FAA for further consideration.

## II.

Before discussing the merits, we must address the FAA's two contentions that we lack jurisdiction to do so. Specifically, the FAA alleges that the municipalities lack standing to bring their petition and, in any event, they brought it too soon. We disagree with both contentions.

To satisfy Article III's "irreducible constitutional minimum of standing," a party must demonstrate injury-in-fact, causation and redressability. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61 (1992); *see also Rainbow/Push Coalition v. FCC*, 330 F.3d 539, 542 (D.C. Cir. 2003). To meet the injury-in-fact requirement, a party must show some "invasion of a legally protected interest which is (a) concrete and particularized[ ] and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (citations and internal quotation marks omitted). Accordingly, "[t]he burden on a

party challenging an administrative decision in the court of appeals is 'to show a substantial probability that it has been injured, that the defendant caused its injury, and that the court could redress that injury.' " *Rainbow/Push Coalition*, 330 F.3d at 542 (quoting *Sierra Club v. EPA*, 292 F.3d 895, 899 (D.C. Cir. 2002)). Here, the municipalities offer, among other alleged injuries, that they bear the cost of their officers' and employees' use of O'Hare for business travel. *See* Petitioners' Br. at 12. This is sufficient, we believe, to satisfy their standing burden. *See Rainbow/Push Coalition*, 330 F.3d at 542. Having to pay the passenger facility fee every time an officer or employee enplanes at O'Hare is a legally cognizable injury, directly traceable to the FAA's order authorizing it and redressable by a favorable ruling from us. *See Cmtys. Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 684–85 (D.C. Cir. 2004) (organization had standing to sue where members would be exposed to increased noise as result of FAA's order approving construction project); *see also Ill. Dep't of Transp. v. Hinton*, 122 F.3d 370, 373 (7th Cir. 1997) (dicta that "passengers who pay the O'Hare passenger facility charge and use . . . O'Hare Airport" would have standing to challenge diversion of revenue).

That the municipalities will not suffer their alleged injury alone—Chicago plans to charge all passengers enplaning at O'Hare—does not, as the FAA alleges, render their injury insufficient to confer standing. *Cf. Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("[W]hen the asserted harm is a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens, that harm alone normally does not warrant exercise of jurisdiction."). The injury the municipalities complain of is no mere "generalized grievance" akin to the one alleged by the citizens in *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 217, 220 (1974), or by the federal taxpayer in *United States v. Richardson*, 418 U.S. 166, 175–77, 180 (1974), but a specific injury shared by a specific—albeit large—group of air travelers, to which their officers and employees belong. *See, e.g., Sierra Club v. Morton*, 405 U.S. 727, 734 (1972) ("[T]he fact that particular environmental interests are shared by the many rather than

the few does not make them less deserving of legal protection through the judicial process."); *Common Cause v. DOE*, 702 F.2d 245, 251 (D.C. Cir. 1983) ("[T]he widespread character of an alleged injury does not demean the standing of those who are in fact injured.").

Nor do we think the municipalities' alleged injury too attenuated or distant to represent a constitutionally-sufficient injury-in-fact, as the FAA asserts, by virtue of the fact that Chicago will not start collecting the passenger facility fee the FAA authorized until 13 years from now. That Chicago intends to spend today what it is authorized to collect tomorrow does not render the municipalities' alleged injury "conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal quotation marks omitted). The FAA's order is final and, absent action by us, come 2017 Chicago will begin collecting the passenger facility fee; accordingly, "the impending threat of injury [to the municipalities] is sufficiently real to constitute injury-in-fact and afford constitutional standing." *Wyo. Outdoor Council v. United States Forest Serv.*, 165 F.3d 43, 51 (D.C. Cir. 1999); *cf. Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) ("A threatened injury must be certainly impending to constitute injury in fact." (internal quotation marks omitted)). So, too, is the municipalities' petition ripe for our review now.

The ripeness doctrine requires us to consider "the fitness of the issues for judicial review and the hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977); *see Harris v. FAA*, 353 F.3d 1006, 1011–12 (D.C. Cir. 2004). Under the doctrine's first prong, "we look to see whether the issue is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final." *Clean Air Implementation Project v. EPA*, 150 F.3d 1200, 1204 (D.C. Cir. 1998) (internal quotation marks omitted), *cert. denied sub nom. Appalachian Power Co. v. EPA*, 527 U.S. 1021 (1999). And under the second, we consider "not whether the[ parties] have suffered any 'direct hardship,' but rather whether *postponing* judicial review would impose an undue burden on them or would

benefit the court." *Harris*, 353 F.3d at 1012 (emphasis in original); *see also Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998); *AT&T v. FCC*, 349 F.3d 692, 700, 702 (D.C. Cir. 2003). The FAA's decision is plainly "fit" for our consideration now as the municipalities challenge a final FAA order on purely legal grounds, *see Atl. States Legal Found., Inc. v. EPA*, 325 F.3d 281, 284 (D.C. Cir. 2003) ("Claims that an agency's action is arbitrary and capricious or contrary to law present purely legal issues."), which challenge, by statute, they have only sixty days to make. *See* 49 U.S.C. § 46110(a) ("The petition must be filed not later than 60 days after the order is issued."). Moreover, although the FAA reasonably asserts that the municipalities will not "suffer [any] immediate hardship from an EIS," Respondent's Br. at 23, we see no benefit to us in *postponing* review of its final order. *See, e.g., Harris*, 353 F.3d at 1012. Postponing review, moreover, could burden the parties by preventing the municipalities from bringing their challenge at all, *see* 49 U.S.C. § 46110(a), or by leaving in doubt whether Chicago will recoup the funds it spends on the EIS. Accordingly, the municipalities' petition is ripe for our consideration.

Finding that the municipalities have standing to petition for review of the FAA's action and did not jump the gun in doing so now, we accordingly turn to the merits of their petition. We agree that the FAA acted arbitrarily, capriciously and contrary to law in authorizing Chicago's Runway Formulation Project with an estimated total cost of over $220 million—half to pay for the EIS, half to cover financing and interest costs. *See* 5 U.S.C. § 706(2)(A); *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Before authorizing the City's passenger facility fee, the FAA must find, based on Chicago's application, that the amount it proposes to impose and use "is not more than the amount necessary to finance the specific project." 49 U.S.C. § 40117(d)(1). The FAA failed to do so, however, which error is fatal to its approval of the fee application. *See* 5 U.S.C. § 706(2)(A); *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

One thing the parties appear to agree on is that over $110 million for an airport project EIS is an extraordinarily high estimate.[5]  Despite the FAA's repeated assurances that the City may only use this immense sum to fund an EIS of the modernization program,[6] however, it simply accepts at face value that the sum is in fact *necessary* to do so.  *See* 49 U.S.C. § 40117(d)(1).  Chicago's modernization project may be so unique that over $110 million is necessary to pay for an EIS regarding it, but the FAA never said as much.  *See PanAmSat v. FCC*, 198 F.3d 890, 897 (D.C. Cir. 1999) ("We do not ordinarily consider agency reasoning that 'appears nowhere in the [agency's] order.'" (quoting *Graceba Total Communications, Inc. v. FCC,* 115 F.3d 1038, 1041 (D.C. Cir. 1997)));  *see also SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).

---

[5] *Compare* Petitioners' Br. at 25 ("A quarter of a billion dollars is an exorbitant and unprecedented amount to fund an airport environmental study.  The proposed funding level would be an order of magnitude greater than any EIS in aviation history."), *with* Oral Arg. Tr. at 16:50 (FAA counsel acknowledging EIS estimate is "extraordinarily high") & 18:31 (FAA counsel acknowledging "we all agree that [the EIS estimate] is an extraordinarily high number based on what anyone has ever done in this connection"); *cf. Uncertain Economy Forces Scaling Back of Int'l Airport's First Phase*, Aviation Week & Space Technology, Mar. 11, 1991, at 48 ("Pre–1990 planning [for Denver International Airport], including the [EIS] and airport master plan, cost an additional $*20.716* million." (emphasis added)), *reprinted in* Petitioner's Br. at App. B.

[6] *See, e.g.*, J.A. 360 ("this project includes only work . . . leading to the completion of an EIS");  J.A. 361 ("[t]his formulation project will result in an EIS . . . and does not include any construction or land acquisition costs nor does it include any design work beyond what the FAA agrees is necessary to complete the EIS process");  J.A. 368 ("the FAA is only approving those tasks needed in order to complete the [EIS] for the proposed [modernization program]");  J.A. 369 ("the FAA is only approving the tasks necessary for preparation of the [EIS]");  J.A. 370 ("the FAA is limiting its approval to only that work which the FAA agrees is required for the completion of an [EIS]").

The municipalities have an explanation of their own for Chicago's eye-popping EIS estimate. They point out that Chicago's initial "clarification" of its passenger facility fee application estimated that "Project Formulation," including the "[c]ompletion of all planning [and] *environmental processing*," would cost $42 million, while preliminary engineering— "[t]o transition from initial planning concepts into formal design"—and runway design would cost an additional $45 and $99 million, respectively. J.A. 254 (emphasis added). In response to the FAA's concerns about the scope of the project, however, the City clarified its application again less than one week later, this time purporting to limit the project to the tasks necessary to prepare an EIS. *See* J.A. 255–58 ("[W]e have spent a good deal of time clarifying the information we sent previously, and reconsidering the level of [passenger facility fee] resources needed in support of the environmental process."). But in the City's second clarification, it estimated that "Program Formulation," again including planning and environmental processing as well as "[p]reliminary engineering in support of [the] environmental review process," would total $93.1 million.[7] J.A. 257–58.

Why did Chicago's cost estimate for planning and environmental processing balloon in less than a week from $42 million to over $93 million? The municipalities allege that the cost of planning and environmental processing in fact did not change—Chicago merely moved the preliminary engineering work to support the formal design of the modernization program that the FAA questioned—as well as its associated costs—into those categories. The FAA, the municipalities

---

[7] Chicago also estimated in its second application clarification that "Phase 1 Project Formulation" would cost $27.9 million, *see* J.A. 260–61, in addition to the $93.1 million for "[p]reliminary engineering in support of [the] environmental review process." J.A. 258. In a revision of its second clarification, the City provided the identical cost estimates for "Program Formulation" and "Phase 1 Project Formulation." As discussed above, the FAA ultimately authorized Chicago to collect approximately $220 million, having reduced the City's bond capital and financing and interest estimates by over $10 million apiece. *See* slip op. *supra* at p.6 & n.4.

say, unwittingly authorized the City to fund preliminary engineering and formal design work in furtherance of its modernization program beyond that necessary to complete the EIS. The FAA made no effort to dispel the municipalities' theory. Nor does Chicago's application (together with the clarifications thereof) on its face explain what the FAA itself failed to, *see Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned" (internal quotation marks omitted)), for the generic task list it contains tells us nothing about the specific costs of the tasks or why they are necessary to prepare an EIS.

By statute, the FAA's factual findings are "conclusive" if based on "substantial" record evidence. *See* 49 U.S.C. § 46110(c). Despite Chicago's extraordinarily high cost estimate of its proposed EIS and the FAA's express statutory duty, however, the FAA made not one finding regarding the necessity of over $110 million to prepare an EIS for the modernization program. The FAA simply concluded that the fee "will not result in revenue that exceeds the amount necessary to finance the projects." J.A. 358. But in these circumstances, such a simple recitation of the statutory standard neither satisfies the statute, *see* 49 U.S.C. § 40117(d)(1), nor assures us that the agency's decision is rational. *See* 5 U.S.C. § 706(2)(A); *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

Seeking to assure us that the authorized sum is necessary, the FAA counsel claims that "[t]he amount of funds necessary to perform air transportation projects is a quintessential example of the type of decision that falls within an agency's expertise and as to which this Court defers." Respondent's Br. at 36. We have no quarrel with this general principle; it is true that we owe considerable deference to an agency's exercise of its judgment and expertise in estimating costs.[8]

[8] *See Nat'l Ass'n of Secs. Dealers, Inc. v. SEC*, 801 F.2d 1415, 1419 (D.C. Cir. 1986) (Buckley, J. ("Because '[r]atemaking is … much less a science than an art,' and because '[c]ost itself is an inexact standard,' this court has held that 'great deference is given

We do have difficulty, however, with its application in this case. The FAA cannot simply declare its "expertise"; it must exercise that expertise and demonstrate sufficiently that it has done so[9] else we have nothing to review much less defer to. Nor is it enough for the FAA to assert that we need not worry about Chicago's fee now because the municipalities can mount a challenge later if Chicago in fact diverts passenger facility fee revenue to any unapproved projects. The assertion is irrelevant, however, to the municipalities' current challenge because the FAA must specifically find that the fee will not generate excessive revenue *before* authorizing its assessment and collection. *See* 49 U.S.C. § 40117(d)(1).

\* \* \*

For the foregoing reasons, we grant the municipalities' petition for review and remand the matter to the Federal Aviation Administration for its further consideration in accordance with this opinion. In light of this holding, we do not reach the municipalities' other claims.

*So ordered.*

---

to [agency] expertise and judgment on the reasonableness of a particular rate proposal . . . .' " (quoting *Al. Elec. Coop., Inc. v. FERC,* 684 F.2d 20, 27 (D.C. Cir. 1982) (alternations in original)))).

[9] *Cf. Am. Lung Ass'n v. EPA*, 134 F.3d 388, 392 (D.C. Cir. 1998) ("With its delicate balance of thorough record scrutiny and deference to agency expertise, judicial review can occur only when agencies explain their decisions with precision, for '[i]t will not do for a court to be compelled to guess at the theory underlying the agency's action . . . .' " (quoting *Chenery Corp.,* 332 U.S. at 196–97 (alterations in original))).