# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 23, 2008          Decided December 19, 2008

No. 07-1362

ST. JOHN'S UNITED CHURCH OF CHRIST, ET AL.,
PETITIONERS

v.

FEDERAL AVIATION ADMINISTRATION AND ROBERT A.
STURGELL, ADMINISTRATOR, FEDERAL AVIATION
ADMINISTRATION,
RESPONDENTS

CITY OF CHICAGO,
INTERVENOR

———

On Petition for Review of an Order
of the Federal Aviation Administration

———

*Joseph V. Karaganis* argued the cause for petitioners. With him on the briefs were *Robert E. Cohn*, *Christopher T. Handman*, *A. Bruce White*, and *John W. Kalich*.

*M. Alice Thurston*, Attorney, U.S. Department of Justice, argued the cause for federal respondents. With her on the brief was *Ellen Durkee*, Attorney.

*Benna Ruth Solomon* argued the cause for intervenor. With her on the brief were *Christopher M. Grunewald*, *Sean*

*H. Donahue*, *David T. Goldberg*, and *Michael G. Schneiderman*.

Before: GRIFFITH and KAVANAUGH, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*: This is the latest installment in an ongoing battle between the City of Chicago and the Federal Aviation Administration on the one hand, and various religious and secular communities bordering O'Hare International Airport on the other. In this case, petitioners challenge the FAA's September 4, 2007 Final Agency Decision, which authorizes Chicago to impose Passenger Facility Charges ("PFCs") on passengers using O'Hare, the revenue to be used for airport improvement projects. The religious petitioners claim the FAA violated the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb-1, arguing that one of the projects—runway construction necessitating a cemetery relocation—would "substantially burden" petitioners' exercise of religion, but would not further "a compelling governmental interest." In addition, all petitioners challenge the FAA's decision as failing to comply with statutory and regulatory requirements for approval of PFCs.

We do not reach the merits of the RFRA claim; the religious petitioners failed to establish Article III standing to raise it. Specifically, petitioners did not show a substantial probability that in the absence of PFCs Chicago would leave the cemetery alone. In other words, we cannot conclude that petitioners' success on the merits would likely lead to redress of their alleged injury.

On the merits of the secular claims, we find that the FAA's authorization of PFCs was neither arbitrary nor capricious. Contrary to petitioners' claim, the FAA's finding of "adequate justification," 49 U.S.C. § 40117(d)(3), for each of the disputed projects was not unreasonable. We therefore dismiss the RFRA claim and reject the remaining claims.

\* \* \*

Construction of one of the runways for which Chicago received PFC authorization requires relocation of the St. Johannes religious cemetery. According to the religious petitioners, the relocation offends a "fundamental precept" of their religious beliefs, namely, "that the remains of their co-religionists in the sacred consecrated ground of St. Johannes must remain undisturbed until Jesus Christ raises up the departed on the Day of Resurrection." St. John's Br. 21. Neither the FAA nor Chicago questions the bona fides of this belief.

The three prerequisites of standing—injury, causation, and redressability—are quite familiar. See, e.g., *St. John's United Church of Christ v. FAA*, 520 F.3d 460, 462 (D.C. Cir. 2008). The religious petitioners' theory for satisfying them rests on the claimed essentiality of the PFCs to fund the runway project and concomitant destruction of the St. Johannes cemetery. Chicago, they say, has no other source of funding. The airlines operating at O'Hare are refusing to approve further General Airport Revenue Bonds ("GARBs"), which allow recourse only against such revenue; and the city has promised that O'Hare's modernization will be "at no cost to local or state taxpayers." St. Johns Br. at 3 & n.4; 2 Addendum 363, ¶ 31. Accordingly, the PFC authorization will cause petitioners' RFRA injury, and vacating the

authorization would thwart Chicago's plans and thus redress the injury.

Even assuming arguendo that the religious petitioners could be found to have shown injury and causation, redressability is exceptionally speculative. First, Chicago's political promise to protect Chicago taxpayers from the cost of the O'Hare improvements is just that—a political promise with no legal force whatsoever.

Second, Chicago convincingly disputes petitioners' assertion that it lacks alternative sources of funds to replace the PFCs. In its brief and during oral argument, Chicago pointed out it "does not need . . . airline approval to issue bonds on which principal and interest are payable from airport revenue collected after the current airline agreements terminate in 2018," i.e., bonds not secured by the existing agreements and the associated revenues. Chicago Br. 41. In fact, it has already issued hundreds of millions of dollars worth of such bonds. See *id*.; Oral Arg. Tr. 35. Presumably it can do so again.

Petitioners do not dispute the point. They argue instead that bonds not secured by airline agreements would put Chicago taxpayers at risk, arguably contrary to Chicago's promise. St. John's Br., 2 Addendum 363, ¶ 31. But putting taxpayers at risk (assuming the hypothetical bonds would do so) is not the same as an unconditional city obligation. Airport revenue may well prove adequate, so that no taxpayer payment will be required. Certainly politicians frequently describe schemes that impose such risks on taxpayers as "free" or "at no cost to the taxpayer."

Finally, if we were to vacate the PFC authorization, Chicago could go back to the airlines and attempt to renegotiate. As we have already said during one of this case's

many predecessors in our court, the necessity of renegotiations with the airlines would "not create 'a significant increase in the likelihood' that the project would be scuttled altogether rather than merely delayed." *Village of Bensenville v. FAA*, 457 F.3d 52, 70 (D.C. Cir. 2006) (quoting *Utah v. Evans*, 536 U.S. 452, 464 (2002)). Accordingly, the religious petitioners have not shown the requisite "substantial probability" that any order of ours could redress their injury. *St. John's*, 520 F.3d at 462.

\* \* \*

All petitioners challenge the PFC authorization as failing to comply with relevant statutory and regulatory requirements. Before getting to the merits, we briefly note that petitioners have standing to challenge the authorization. "Having to pay the passenger facility fee every time an officer or employee enplanes at O'Hare is a legally cognizable injury, directly traceable to the FAA's order authorizing it and redressable by a favorable ruling from us." *Village of Bensenville v. FAA*, 376 F.3d 1114, 1119 (D.C. Cir. 2004). As we have just explained how Chicago's alternative sources of revenue defeat redressability of the RFRA claim, one might wonder why they do not have the same effect here. After all, even in the absence of PFCs, passengers in the aggregate will likely pay this same amount through other airport charges—e.g., ones collected via the various concessions at O'Hare. See Oral Arg. Tr. 38. But courts have never required a plaintiff, forced by an agency ruling to pay a specific charge, to show that he or she will in the end escape an equivalent burden (or offsetting reduction in service). To do so would likely end up with the parties searching for—and almost certainly finding— a fee-payer who could show that the alternative would not burden him, or would not burden him as much; this would be true, for example, of an airport patron who used concessions

little or not at all. Given the overwhelming probability of there being some such differently positioned fee-payer, the search would uselessly consume litigation resources.

PFCs are non-federal funds that an airport operator can receive for eligible airport-related projects. They are collected by airlines through ticket charges from their customers. See 14 C.F.R. § 158.3; FAA Br. 5–7. Chicago applied for PFC authorization for four projects related to various improvements at the O'Hare airport. Three projects directly involved runways—the construction of two new ones (including the runway that requires relocation of the St. Johannes cemetery) and an extension of an existing one. In the fourth project, Chicago sought reimbursement for the cost of already-acquired parcels of land surrounding O'Hare. This land was needed for runway construction, overflight protection, Oral Arg. Tr. 31, and other projects related to the building of runways, all intended to improve airport operations and decrease passenger delays. FAA Br. 10–12.

Before the FAA can authorize an airport operator to receive PFC funds, it must find, among other things, that "the application includes adequate justification for each of the specific projects." 49 U.S.C. § 40117(d)(3); see also 14 C.F.R. § 158.15(c) ("An eligible project must be adequately justified to qualify for PFC funding."). FAA Order 5500.1 further spells out the "adequate justification" requirement. In relevant part, the order requires the FAA to "conclude that the sum of aeronautical benefits would not be disproportionately less than project costs." FAA Order 5500.1, ¶ 4-8, 1 Joint Appendix ("J.A.") 205. In making this determination, "there is no requirement for benefit-cost analysis (BCA)." *Id*. But "in the event that a BCA is available on a project, its inclusion in the project application materials should be encouraged." *Id*.

In the FAA's September 4, 2007 decision, it authorized Chicago to collect approximately $1.2 billion of PFCs for the four projects. 14 J.A. 9536. Relying on Chicago's application materials (including a BCA), the FAA found that each project was supported by adequate justification. Petitioners claim, however, that the FAA's decision did not satisfy the requirements set out in Order 5500.1 because the FAA failed to find, in a non-arbitrary fashion, that the benefits of each project were not disproportionately less than project costs.

We review the FAA's compliance with statutory and regulatory requirements under the highly deferential arbitrary and capricious standard. See *Bensenville*, 376 F.3d at 1120. Moreover, when the FAA's determination involves, as here, forecasts of capacity and demand at an airport, even more deference is due. *City of Olmsted Falls, Ohio v. FAA*, 292 F.3d 261, 270 (D.C. Cir. 2002).

In approving Chicago's PFC petition, the FAA relied on the available BCA data. The data were not disaggregated for each project, but were grouped in blocks corresponding to stages in the overall O'Hare improvement program.

Using these data, the FAA reached judgments about the justifiability of the four projects contained in Chicago's application. The three runway projects closely correspond to what is labeled "Phase 1 Airfield" (the only difference is that Phase 1 Airfield includes several taxiways and miscellaneous runway-related projects in addition to the three runways, FAA Br. 10 n.3). In authorizing PFC funds for each of the three runway projects, the FAA noted the benefit-cost ratio of 6.2 for Phase 1 Airfield. 14 J.A. 9453, 9473, 9496. Benefits quantified to produce the ratio were savings in "aircraft, passenger, and cargo delay" and "[i]mproved efficiency of traffic flows." 10 J.A. 6763. It appears that in finding

"adequate justification," 14 J.A. 9554, 9559, 9565, the FAA concluded that the three runways would contribute most of the benefits quantified in the 6.2 ratio. The runway projects were thus not disproportionately costly; together with several taxiways, they produced $6.2 of benefits for every dollar of costs.

Petitioners have offered no direct evidence or reason to think the FAA acted arbitrarily or capriciously in reaching this conclusion. And there's no merit to petitioners' argument that the FAA must show an alternate financial plan in the event that PFC revenues are not made available. There's simply no such requirement. To be sure, Order 5500.1 does require a viable alternative funding source plan, but that is only for Airport Improvement Program ("AIP") discretionary projections, not for PFCs. FAA Order 5500.1, ¶ 4-19(6), 1 J.A. 218–19 ("The financial plan for each project should include . . . [v]iable alternate funding source plan for AIP discretionary projections."). Petitioners have not shown that in approving Chicago's PFC application for the three runway projects the FAA failed to comply with any of the applicable statutory and regulatory requirements.

The FAA analyzed the land acquisition project somewhat differently. Because the land would be used for runway construction in more than one phase of the overall O'Hare improvement plan, FAA Br. 10 n.3, the FAA appears to have relied on the benefit-cost ratio for that overall program (labeled "Total Master Plan"), for which the calculated benefit-cost ratio was 2.02, 14 J.A. 9519.

Arguing against the supposed justifiability of the overall project, petitioners raise what at first glance seems to be a valid argument. They focus on the segments into which the expert consultants organized the BCA data. The following chart, slightly modified from petitioners' presentation, which

in turn is derived from data presented by the FAA, breaks the BCA into segments for Phase 1 Airfield, Total Master Plan, and the increment from one to the other:

| Project | Present Value of Benefits (billions) | Present Value of Costs (billions) |
|---|---|---|
| Phase 1 Airfield | $12.4 | $1.9 |
| Total Master Plan | $12.6 | $6.2 |
| Incremental Difference, Total Master Plan over Phase 1 Airfield | $0.2 | $4.3 |

Obviously the increment from Phase 1 Airfield to Total Master Plan—which we'll call the TMP increment—has a dismal BCA: benefits of $0.2 billion and costs of $4.3 billion. See St. John's Br., 2 Addendum 374. To be sure, this incremental analysis overlooks the benefits *not* quantified in the BCA data. See 10 J.A. 6763 (listing various other benefits—e.g., ability to accommodate larger aircraft, improved passenger comfort, safety improvements, and shortened pedestrian traffic in getting to a desired gate). But the FAA did not rely on these other benefits, and under standard principles we cannot do so either. *SEC v. Chenery Corp.*, 332 U.S. 194, 196–97 (1947). Thus, if the land acquisition were justified only by the counted benefits in the TMP increment, it would seem—short of further segmentation—to be disproportionately costly. To overcome the objection, the FAA must show that a significant portion of the acquisition was necessitated by the first phase of the overall project, Phase 1 Airfield.

Although the FAA did not make our job easy, it appears the agency has done enough—though barely so, and only under the highly deferential arbitrary and capricious standard—to shift the focus away from the TMP increment. On the one hand, the FAA determined that "[m]ost of the [land] is needed for Phase 1 runways," with only "a small portion," six of the 331 parcels, being justified exclusively by runway projects in the TMP increment. 14 J.A. 9519; see also FAA Br. 38. They are the six parcels south of the railroad in the extreme lower left of the following aerial photo:



FAA Br., Addendum Exhibit 1 (excerpt). On the other hand, according to the exhibit, the bulk of the remaining 325 parcels lie directly to the left (west) of runway 10R/28L, which is part of the TMP increment, and well below (south of) the southernmost Phase 1 Airfield runway (10C/28C). See *id*.; 8 J.A. 5423; 10 J.A. 6755.

As best we can resolve the apparent contradiction in the FAA's presentation, most of the land, in fact, serves multiple purposes. In project justification documents filed with the FAA, Chicago described the intended land use as follows: "(1) development of new airfield and landside facilities, and (2) construction-related areas for construction, spoil storage, parking construction equipment, and providing for construction haul roads." 14 J.A. 9512. This will enable

construction of the overall project "in a way that maintains O'Hare in an open and fully functioning mode throughout the entire construction process." *Id*. Thus, when the overall project is finished, most of the land may indeed serve a runway constructed in the TMP increment. But during construction, the land will be used for projects related to Phase 1 Airfield. Because the cost of these parcels appears to be reasonably connected to the construction of Phase 1 Airfield runways, and thus to the benefits they are expected to provide, the FAA reasonably justified the whole land acquisition project by the favorable benefit-cost ratios for the overall program or Phase 1 Airfield—2.02 and 6.2, respectively (perhaps deeming the remaining six parcels de minimis in the grand scheme of 331 parcels). Accordingly, we are not persuaded that the FAA's authorization of PFC funds was either arbitrary or capricious.

Before signing off, we should say a word or two about the Joint Appendix. The parties sent us 15 volumes, totaling 9710 pages. Most pages appear to contain needless repetition— e.g., identical exhibits attached to different applications filed with the FAA in the course of the case's long history at the agency level. Worse, the parties' briefs cite items without telling us in what volume we might find them. 'Nuff said.

* * *

We dismiss the religious petitioners' RFRA claim for lack of standing and, finding the FAA's decision to be neither arbitrary nor capricious, deny the remainder of the petition.

*So ordered.*