Pablo **LLERANDI** and Carmen Phipps Llerandi, Appellants,

v.

**FEDERAL COMMUNICATIONS COMMISSION Hato Abajo Development Corporation, et al., Intervenors.**

No. 88–1152.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 7, 1988.

Decided Dec. 16, 1988.

---

Debra M. Vaughn–Carrington, for appellants. Lauren A. Colby, Frederick, Md., was on the brief for appellants.

Sue Ann Preskill, Counsel, F.C.C. with whom Diane S. Killory, Gen. Counsel and Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., Washington, D.C., were on the brief for the appellee.

Edward W. Hummers, Jr., Robert A. DePont, David L. Hill and Audrey P. Rasmussen, Washington, D.C., were on the joint brief for intervenors, Hato Abajo Development Corp. and Kelly Broadcasting System Corp.

Before WALD, Chief Judge, and STARR and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge STARR.

STARR, Circuit Judge:

This case presents a challenge to the FCC's approval of an assignment of two radio licenses in Arecibo, Puerto Rico. For reasons that follow, we conclude that the challengers have standing to maintain this appeal but that, on the merits, their claim fails.

I

Near the sandy shores of the Caribbean sit the sunbathed communities of Arecibo and Hatillo, Puerto Rico. The two cities, we understand, are only seven miles apart, and in any event the signals of the various radio stations in question clearly overlap. For our purposes, overlapping signals trigger not signal interference concerns but dual ownership concerns embodied in the FCC's duopoly rule. We will therefore pause at the outset of our narrative to relate the relevant law before immersing ourselves in what will appear to be a welter of facts (or, more precisely, a profusion of names of the various corporations and individuals who figure in this drama). In brief, the duopoly rule, codified at 47 C.F.R. § 73.3555(a)(1), prohibits the common ownership of two AM stations whose signals overlap to the degree set forth in the rule (namely, an "overlap of the predicted or measured 1 mV/m groundwave contours of the existing and proposed AM stations, computed in accordance with [other Commission rules]"). As to the law, all parties are cheerfully in accord (save for a standing issue, which we shall attend to presently). The bone of contention is the facts.

The gentle reader will be well advised to attend to the program listing the *dramatis personae*. Entering the stage first are the two appellants, Pablo Llerandi and Carmen Phipps Llerandi. Our tale begins in 1980, when the Llerandis, who are residents of Arecibo, purchased Arecibo Radio Corp. That company was seized of the licenses and physical assets of radio stations WNIK and WNIK–FM in Arecibo. The Llerandis purchased the two stations (or, more precisely, the corporation which in turn owned the licenses), from the Hato Abajo Development Corp. Arecibo Radio, now owned by the Llerandis, agreed to make a series of payments to Hato Abajo. Unfortunately, the Llerandis were unable to comply with that agreement. As they themselves point out, "the Llerandis defaulted on a series of

payments to the sellers [Hato Abajo] and thus, a default judgment was entered against them."[1] Reply Brief at 7. The latter event occurred in the courts of the Commonwealth, eventuating in a judicial directive that the licenses owned by Arecibo be assigned to Hato Abajo. That action in the Puerto Rico courts was then supplemented by FCC action, embodied in a Memorandum Opinion and Order released August 13, 1985. Following its practice of deferring to state court resolutions of contract disputes, *see, e.g., Radio Station WOW, Inc. v. Johnson,* 326 U.S. 120, 65 S.Ct. 1475, 89 L.Ed. 2092 (1945); *Kirk Merkley, Receiver,* 94 F.C.C.2d 829 (1983), the FCC went on to find that Hato Abajo was "fully qualified to become a Commission licensee and that the grant of the assignment applications would serve the public interest." *Arecibo Radio Corp.,* FCC 85–462 at 6 (Aug. 13, 1985), Joint Appendix (J.A.) at 124. Hato Abajo thus became seized once again of the licenses. The Commission's order was unappealed from and hence became final. 47 U.S.C. § 402(c).

With litigation between Hato Abajo and the Llerandis (Arecibo) continuing to unfold in the courts of the Commonwealth, as well as in federal district court in Puerto Rico, another corporate actor entered the scene. Act II of this drama begins with Hato Abajo, which was devoting a considerable amount of energy to fending off the outraged Llerandis in various court actions, seeking once again to rid itself of the radio stations. In November 1986, Hato Abajo filed an application with the FCC to assign the two licenses to yet another corporation, Kelly Broadcasting System Corp. Kelly has two owners. They are relatives. And those two owner-relatives have yet other relatives who own yet another corporation which in turn owns yet another radio station, WMSW, situated in nearby Hatillo. The names, which will now be set forth for the reader's edification, have sufficient

---

1. The Llerandis came contractually to grief, we are told, by virtue of Arecibo's having "large outstanding debts which had not been disclosed to them. This indebtedness, amounting to more than $100,000, had to be paid. The Llerandis'

remaining assets were quickly dissipated and they found it impossible to keep up the payments to the sellers." Reply Brief at 8 (citation omitted).

similarity (as befits a group of close relatives) that the FCC composed a helpful chart at p. 9 of its brief. We shall refrain from doing that, although the temptation is substantial. Instead, we shall try to be as clear as possible and hope for the best.

Kelly Corp. is a newcomer to the world of radio broadcasting. Its two owners are an uncle and his dutiful nephew. The uncle is Hector Santos Rivera. Uncle Hector owns 50 percent of Kelly Corp. The other owner is Raul Santiago Santos. Nephew Raul owns the other 50 percent of Kelly. All would be peace and light under FCC rules save for the ownership structure of yet another corporation, Aurora Broadcasting Corp., which owns the AM station in Hatillo (which, again, is near the Llerandis' home base of Arecibo). When Kelly Corp. entered the FCC's administrative apparatus by virtue of Hato Abajo's assignment application, Kelly's two principals (Uncle Hector and Nephew Raul) had ownership interests in the Hatillo outfit, Aurora, to the tune of 35 percent (Uncle Hector's share) and 10 percent (Nephew Raul's share). The alert reader will have immediately surmised that a substantial chunk of Aurora's equity rested in hands other than those of Uncle Hector or Nephew Raul. Quite right. But there is no mystery. We now introduce to the audience two other owners of Aurora (with two other actors waiting backstage to be introduced and one of whom looms very large indeed in the Llerandis' duopoly analysis).

Now coming onstage are Zaida Santos Rivera, who is Nephew Raul's mother and Uncle Hector's sister. Prior to the Hato Abajo–Kelly Corp. transaction, Zaida owned 35 percent of Aurora's stock. Her other son, Nephew Raul's brother, Hector Santiago Santos, owned a modest 10 percent of Aurora (just like Nephew Raul). The remaining 10 percent of Aurora was owned by one Miguel Angel Garcia, who is, thankfully, not a relative of any of the foregoing.

That, then, was the ownership of Aurora in the pre-Kelly era. To review our program notes: Aurora owned an AM radio station, broadcasting merrily away, and was in turn owned by four relatives and one non-relative. The relatives were Uncle Hector, Zaida (who was Hector's sister), and Zaida's two sons, Nephew Raul and Son Hector. In view of Aurora's ownership structure, the violation of the FCC's duopoly rule, were the Commission to grant the Hato Abajo assignment application, was manifest; thus Kelly Corp. represented to the FCC that its two principals (Uncle Hector and Nephew Raul) would rid themselves of their holdings in Aurora. How? By selling their respective shares to their two colleague-principals in Aurora, namely Zaida and Son Hector. The odd man out (or, more precisely, the sole non-relative), Miguel Angel Garcia, would remain a modest 10 percent owner, with Zaida and Son Hector thereafter owning 45 percent each of Aurora. The net effect of all this was to increase modestly Zaida's ownership interest in Aurora (from 35 percent to 45 percent), to give a big boost in Aurora's ownership to Son Hector (from 10 percent to 45 percent), and to eliminate entirely Uncle Hector's 35 percent interest, as well as Nephew Raul's modest 10 percent share, in Aurora. In short, after the transactional dust settled, Zaida's two sons would have become principals, respectively, in the two broadcasting companies.

This ownership arrangement was viewed with considerable suspicion by the Llerandis. As they came to see it, the real power behind all these maneuverings was Zaida's husband, Raul Santiago Roman. If still sentient, the reader will note that the name of Raul Santiago Roman has not heretofore graced our list of *dramatis personae*. This eventually struck the Llerandis as curious, especially since Raul Santiago Roman was not, as we shall presently see, blissfully unengaged in the affairs of Aurora Broadcasting. But, on the record before the FCC, the hapless Raul Santiago Roman found himself without the most modest (or even nominal) ownership interest in the two corporations in which his relatives (including his two sons) figured so prominently. Thus it was that Raul Santiago Roman, father to Nephew Raul and Son Hector, husband to Zaida, and brother-in-law of Uncle Hector, seemed to be left out in the

Caribbean heat while inside, in air-conditioned comfort, his relatives were all enjoying the fruits of broadcast ownership. The Llerandis came to think this strange.

The Llerandis repaired to the FCC, assailing the arrangement and pointing to the close family relationships among the owners of Aurora and Kelly. Specifically, with their pitched legal battle against Hato Abajo still underway, the Llerandis filed a petition to deny Hato Abajo's assignment application. The Llerandis counseled the Commission against hasty action, pointing to ongoing litigation elsewhere and in particular the pendency of an appeal at that time before the First Circuit in Boston. Petition to Deny at 5, J.A. at 92. But, pressing on to the merits, the Llerandis complained that the application "clearly violates the provisions of Section 73.3555(a) of the Commission's Rules and Regulations." *Id.* at 6, J.A. at 93. Noting the contour overlap and the ownership arrangement, the Llerandis stated:

> Thus, it is proposed that family members, closely related and clearly in privity, are to own two AM broadcast stations located in towns only seven miles apart and having an enormous overlap of 1 mv/m contours.

*Id.* at 7–8, J.A. at 94–95. The petition also alleged a violation of the Commission's cross-ownership rules (a matter not before us), but in that connection noted that "[i]t is difficult to envisage a closer family relationship than that of mother and son." *Id.* at 8, J.A. at 95.[2]

The Llerandis' assault met with stout opposition. Hato Abajo and Kelly, proceeding jointly, responded to the duopoly rule charge in the following way:

> These allegations [of duopoly rule violations] are based on the [Llerandis'] unsupported conclusions regarding the stock ownership by certain family members of Aurora ... and by other family members who propose to be stockholders of [Kelly]....

Without one supporting fact, the Petitioners leap to the conclusion that ownership of [Aurora] by close relatives of the proposed owners of [Kelly] amounts to common control.

Joint Opposition to Petition to Deny at 9, J.A. at 113. The opposition went on to state that, notwithstanding the closeness (presumably) of the mother-son relationship, "[t]he Commission has never had a policy of attributing ownership interest from mother to son or *vice versa*. In short, the Petitioners' assertion runs counter to FCC policy." *Id.* at 9–10, J.A. at 113–14. Supporting authority was mustered to buttress that proposition, including *Valley Broadcasting Co.*, 58 Rad.Reg.2d (P & F) 945 (1985), and *Southern Indiana Broadcasters, Inc.*, 14 Rad.Reg. (P & F) 117 (1956). In particular, Hato Abajo and Kelly featured, unhelpfully for the Llerandis, the following quotation from the Commission's *Valley Broadcasting* decision: " 'The Commission has long held that a familial/business relationship, standing by itself, is not sufficient to create a presumption of common control for the purpose of applying the multiple ownership rule.' " J.A. at 114 (quoting *Valley Broadcasting Co.*, 58 Rad.Reg.2d (P & F) at 947).

The Llerandis, as was appropriate, sought to have the last word, embodied in their Reply to the Joint Opposition. As pertinent to the issue before us, the Llerandis once again emphasized the closeness of the family relationships. The Reply put it this way: "Since there is a close family relationship (uncle) between the son who will own 50% of the Arecibo property [*i.e.*, Kelly] and the owner of the other 50%, the question is a broad one amounting, in substance, to the question of whether a mother and son can control two AM stations in the same market." *Id.* at 132–33. The Llerandis argued that no prior Commission decision had upheld such an ownership arrangement, and sought to distinguish the facts of Hato Abajo–Kelly's leading authority, *Valley Broadcasting*. *Id.* at 133–34. The Reply concluded:

**2.** Attached to the Petition to Deny was an affidavit by Pablo Llerandi, stating in clear terms: "I am a resident of Arecibo, Puerto Rico." J.A. at

99. The pertinence of this item of evidence will become manifest in our discussion of standing, *infra* at text pp. 85–86.

Thus, the Commission's decision in *Valley* does not stand for the proposition that a parent and child can own stations of the same class in the same community. Were the Commission to adopt such a blanket endorsement of parent and child ownership, the multiple ownership rules would become absolutely meaningless. Every child has a parent and all parents, by definition, have children. Thus, the door would be open for families to control two or more AM stations, two or more FM stations and/or two or more TV stations in any community, simply by allowing the mother or father to own one station and the son or daughter to own the other station.

*Id.* at 134–35.

Thus the pleading cycle concluded. Under the Commission's rules, 47 C.F.R. § 1.45(c), once a reply to the opposition is filed, "[a]dditional pleadings may be filed only if specifically requested or authorized by the Commission." Notwithstanding that rather clear bar, both parties were apparently so intrigued by the agency proceedings that they decided to keep on litigating. Hato Abajo and Kelly opened fire, filing leave to file a "Supplement to Joint Opposition to Petition to Deny," and in the latter document attacked various aspects of the Llerandis' Reply as misleading or erroneous, including its discussion of prior Commission case authority. This tack did not go unnoticed by the Llerandis, who were moved to file a "Reply to 'Supplement to Joint Opposition to Petition to Deny.'" With this document, the Llerandis removed themselves from the lofty ground of law to the trench warfare of facts:

> More importantly, Petitioners have conducted additional investigations of the family and business relationships among the proposed owners....

Reply to "Supplement ..." at 2, J.A. at 151. With that lead-in, the Llerandis reported on the fruits of their investigations. Now, at long last, the FCC was being introduced to the heretofore invisible father of Nephew Raul and Son Hector, Raul Santiago Roman. The Llerandis' introduction was dramatic: "Mr. Roman is the patriarch of the family and there is evidence that he actually controls the family broadcasting activities." *Id.* at 3, J.A. at 152. The evidence consisted of two items: an affidavit by a former employee of the Hatillo station who allowed that it was the father, Raul Santiago Roman, who "always acted as if he owned the station, save when it came to paying the employees, which task was handled by his wife." *Id.* The second item was the report of a private investigator engaged by the Llerandis. The private eye had unearthed the following data:

> As the investigator indicates, he conducted an interview with Raul Santiago Roman, who denied that he was the owner of Station WMSW and contended that his wife and children were the owners and operators of the station. However, in the course of the interview, Mr. Roman referred to Aurora Broadcasting Corporation ... by using the term 'we,' thereby indicating that he considered it to be a family business. Additionally, the investigator visited the offices of Hector Santiago Santos (known as Kelly) who is identified in the Joint Opposition as an attorney and the proposed secretary and director of Aurora.... While the investigator was at the offices of Attorney Hector Santiago Santos, Hector's brother, Raul, drove up to the office in a BMW gray automobile. Raul, who is known as 'Cuco,' is also an attorney, but does not practice law.
>
> ... [I]t is evident that Raul's visit had a business purpose and it is probable that such visits are frequent. Thus, the presumption arises that, because Hector and Raul are brothers and both are doing business in the Arecibo area, and because they do business with each other, these individuals are 'in privity' and should be treated as having an identity of interests.

*Id.* at 153–54.

II

With issue thus joined, the matter went before the Mass Media Bureau. On April 10, 1987, the Chief of the Audio Services Division of that Bureau (Mr. Eads) communicated with counsel as follows: first, that

under Rule 1.45 of the Commission's Rules, the post-pleading cycle submissions by both parties were unauthorized and were thus not being considered;[3] second, that petitioners had "standing to maintain the petition with respect to the issue of alleged violation of [the duopoly rule] because [they] are residents of the city of license ... and, as members of the listening public ... may be deemed parties in interest," J.A. at 4; and, finally, that "[t]he Commission's long-standing policy has been the presumption of nonattribution of the interests of family members unless there is credible evidence that the parties are not independent of one another" and that evidence had simply not come forth to rebut the applicants' affirmation of independence from one another. *Id.* at 5. Accordingly, Mr. Eads granted the assignment applications and denied the Llerandis' objection.

In a brief, three-paragraph order released February 10, 1988, the Commission denied the Llerandis' ensuing application for review. *Id.* at 1. This appeal followed.

### III

■ We are met at the outset with the Commission's contention that the Llerandis lack standing to maintain the present appeal. The FCC emphasizes that, throughout their participation in the agency proceedings, appellants alleged "only ... an injury to themselves in their capacity as the former owners of the station whose license had been, according to the Llerandis, wrongfully taken from them." Brief for Appellee at 16. As the Commission sees it, it is now too late in the day for the Llerandis to enter the province of the Article III courts, limited as we are to resolving actual cases and controversies, and blithely assert standing as listeners under this court's decision in *Office of Communication of the United Church of Christ v. FCC*, 359 F.2d 994 (D.C.Cir.1966). What is more, the FCC continues, the Llerandis have not alleged in what particular their interests as listeners

have been injured by virtue of the Commission's grant of the assignment.

The FCC's assault is misconceived. The Commission readily concedes, as it must, that the Llerandis are listeners. Indeed, that fact, which the Pablo Llerandi affidavit set forth in the most express terms, *see supra* p. 83 n. 2, is uncontested and *ex proprio vigore* establishes the requisite injury necessary to satisfy the strictures of Article III. It is thus rather late in the day for the Commission, which itself implicitly accepted Mr. Eads' determination of the Llerandis' capacity as listeners, to be challenging their status as such.

Not only does the FCC readily concede that the Llerandis are listeners, but the Commission does not, as we understand it, quarrel with the proposition that listeners are indeed able to invoke and press the duopoly rule. The ultimate point of the duopoly rule is, after all, to assure (or at least enhance) diversification of viewpoints within the broadcast industry. That is, the FCC serves (at Congress' behest) as the public's proxy in assuring, through the apparatus of agency licensure, that media outlets in the same market do not fall into a small number of closely related hands. Listeners are, by definition, "injured" when licenses are issued in contravention of the policies undergirding the duopoly rule.

Upon analysis, the FCC's objection boils down to one of pleading and litigation strategy. As the Commission sees it, it is too late in the day (and perhaps a tad unfair) for a litigant to adopt litigating posture 1 (say, that of a disgruntled competitor or potential competitor) in the agency proceedings, and then, lacking success before the agency, seek refuge in court by invoking litigating posture 2 (say, as a listener). But we think these concerns are the not insignificant ones of orderliness and fair dealing in agency litigation, values which are served not by standing doctrine but by exhaustion principles, including those embodied in 47 U.S.C. § 405 (1982). Indeed, the FCC implicitly recognizes as

---

**3.** The result, as the reader will readily gather, of Mr. Eads' reliance on Rule 1.45 was to foreclose consideration of the Llerandis' proffered evidence of the ex-employee's affidavit and the investigator's report.

much in an enlightening footnote that gets to the heart of what is really at issue in this respect. There, the FCC's counsel makes the point this way:

The spirit, if not the letter, of Section 405 ... would certainly seem to require that if injury to a listener's interest is to be the basis on which judicial standing will be claimed, that injury should first be alleged before the agency as ... it was in [*United Church of Christ*] the leading case on listener standing.

Brief for Appellee at 17 n. 14. Perhaps so. But we need not dwell on, much less resolve, whether that is indeed so. For here, not only did the agency have before it Mr. Llerandi's affidavit specifically alleging his status as a listener, but the Mass Media Bureau expressly relied on petitioners' standing as listeners. The FCC's retort that the Commission is at liberty to " 'allow persons without Article III "standing" to participate in FCC proceedings,' " *id.* at 15 (quoting *California Association of the Physically Handicapped, Inc. v. FCC*, 778 F.2d 823, 826 (D.C.Cir.1985)), is obviously beside the point. It simply cannot be that the agency is being blindsided or sandbagged, part of the ultimate normative justification for section 405, when the agency itself has formally annointed the Llerandis (correctly) with listener status. The point is, the values of orderliness and fairness have been fully served where, as here, the Llerandis specifically brought their status as listeners to the Commission's attention and the FCC then saw fit to rely upon that status in resolving this case. Nothing more is needed.

## IV

■ We come now to the merits, but we need not tarry long. The Llerandis have mounted what can only be termed, charitably, a weak challenge to the Commission's action. For reasons that do not appear in the record, the Llerandis chose to take their stand before the Commission on the law, rather than coming forward with specific facts, to support their claim of violation of the duopoly rule. But surely the Llerandis knew that they were rowing upstream. The Commission has time and again held that the existence of a family relationship, without more, simply does not even give rise to a multiple ownership issue. The FCC traces that position back a generation ago, to the tenure of President Eisenhower. *See Southern Indiana Broadcasters, Inc.*, 14 Rad.Reg. (P & F) 117, 120 (1956). That is quite a long time. On through the past three decades the rule has been the same. *See, e.g., Valley Broadcasting Co.*, 58 Rad.Reg.2d (P & F) 945 (1985); *KTRB Broadcasting Co.*, 46 F.C.C.2d 605, 607 (1974).

The Commission's studied, consistent policy in this respect put the onus on the Llerandis to come up with facts to rebut the FCC's time-honored presumption against attribution of family interests. We have previously described in some detail the thrust of the Llerandis' pleadings before the FCC, and we therefore need here only to set forth our evaluation of them. They are, in short, long on generalities and short on facts. Indeed, the Llerandis were essentially pressing for the Commission to abandon its non-attribution policy with respect to the mother-son relationship. This brave, but risky, tack was brought home by the responsive pleading filed by Hato Abajo and Kelly (jointly) to the effect that the Llerandis had come up with no facts whatever about the specific relationship between Zaida and Nephew Raul (and the other family relationships among the various owners of Aurora and Kelly respectively). The words of the Hato Abajo–Kelly opposition must have been a tad haunting to the Llerandis: "These allegations are based on the Petitioners' *unsupported conclusions....* *Without one supporting fact*, the Petitioners leap to the conclusion that ownership [of the Hatillo station] by close relatives of the proposed owners ... amounts to common control." Joint Opposition at 9, J.A. at 113 (emphasis added).

■ It was only in their post-pleading cycle submission that the Llerandis came forward with specific facts. Those facts were designed to show that the power behind the corporate throne was the father, Raul Santiago Roman, and that the two brothers (Nephew Raul and Son Hector)

were closely tied in their business dealings. But this was too little too late. The Mass Media Bureau invoked, as it was entitled to do, *see, e.g., Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 566, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980); *Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 523–25, 98 S.Ct. 1197, 1201–03, 55 L.Ed.2d 460 (1978); *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 413–14, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945), an FCC rule which is admirably clear in its terms. 47 C.F.R. § 1.45(c). To get this evidence in, the Llerandis were forced to rely upon the sufferance of the FCC. Their effort was rebuffed, and it will not do (as the Llerandis would) to point to the interval between the close of the pleading cycle and the date of the Bureau's decision and then complain that the facts could have been considered by the agency decisionmaker. Of course they could, but that is beside the point. Not only are we mindful that rules are rules, *see Reuters Ltd. v. FCC,* 781 F.2d 946 (D.C.Cir.1986), and that rules bind litigants before the agency as well as the agency itself, but those of us who are privileged to serve in courthouses should be the very last to fault an agency's effort to bring orderliness and predictability (and finality) to the litigation process when courts indulge (and for good reason) in precisely the same practice. *See, e.g.,* Fed.R.App.P. 40(a), 28(c) (1985); General Rules of the U.S. Court of Appeals for the District of Columbia Circuit 15(a)(4) (1987).

That being so, the Llerandis are obliged here, as they were before the FCC, to take their stand on the submissions which were properly within the pleading cycle. And in that particular, the FCC's succinct response sounds the death knell for the Llerandis' final attack:

> In their petition to deny and their reply to the opposition to their petition the Llerandis supplied no evidence rebutting Raul's and Hector's claims of independence. Rather, the Llerandis merely asserted that the family relationship itself violated the duopoly rule. That assertion was clearly insufficient in view of the overwhelming weight of Commission precedent.

Brief for Appellee at 21–22 (citations omitted).

Just so.

AFFIRMED.