# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 2, 2004        Decided February 4, 2005

No. 01-1072

RAINBOW/PUSH COALITION,
APPELLANT

v.

FEDERAL COMMUNICATIONS COMMISSION,
APPELLEE

CURATORS OF THE UNIVERSITY OF MISSOURI,
INTERVENOR

———

No. 04-1084

RAINBOW/PUSH COALITION,
APPELLANT

v.

FEDERAL COMMUNICATIONS COMMISSION,
APPELLEE

CURATORS OF THE UNIVERSITY OF MISSOURI,
INTERVENOR

———

Appeals of Orders of the
Federal Communications Commission

———

*William L. Lowery* argued the cause for the appellant. *Holly L. Saurer* and *David E. Honig* were on brief.

*Jacob M. Lewis*, Attorney, Federal Communications Commission, argued the cause for the appellee. *John A. Rogovin*, General Counsel, *Richard K. Welch* and *Daniel M. Armstrong*, Associate General Counsel, and *Lisa E. Boehley*, Counsel, Federal Communications Commission, were on brief. *Jane E. Mago*, Assistant General Counsel, and *C. Grey Pash, Jr.*, Counsel, Federal Communications Commission, entered appearances.

*Kathryn R. Schmeltzer* argued the cause for the intervenor. *Barry H. Gottfried* was on brief.

Before: HENDERSON, ROGERS and TATEL, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* HENDERSON.

Dissenting opinion filed by *Circuit Judge* ROGERS.

KAREN LECRAFT HENDERSON: Appellant Rainbow/PUSH Coalition (Coalition) appeals two decisions of the Federal Communications Commission (FCC, Commission) which granted the application of the Curators of the University of Missouri (University) to renew a license to operate radio station KWMU-FM in St. Louis, Missouri. In the first decision the FCC granted the application subject to a Notice of Apparent Liability (NAL) against the University in the amount of $8,000, denying the Coalition's petition to deny renewal based on allegations of discriminatory employment practices, *Curators of Univ. of Mo.,* No. 00-445, 16 F.C.C.R. 1174 (2001); in the second the Commission granted the University's petition to reconsider and rescinded the NAL, *Curators of Univ. of Mo.,*

No. 03-303, 19 F.C.C.R. 3030 (2004). In each decision the Commission rejected the Coalition's request to designate the application for hearing pursuant to 47 U.S.C. § 309(e) and on appeal the Coalition asks that we remand for just such a hearing. Without reaching the merits of the Commission's decisions, we dismiss both of the appeals because the Coalition has failed to establish it has constitutional standing to bring them.

## I.

The University filed its license renewal application in September 1996. In January 1997 Rainbow filed a petition to deny the application under 47 U.S.C. § 309(d)(1), asserting that the University had violated the FCC's Equal Employment Opportunity (EEO) rule, 47 C.F.R. § 73.2080, by discriminating on the basis of race in its employment decisions. Appended to the petition to deny were declarations by one former part-time employee, Winnie Sullivan, who had filed a discrimination complaint against the University with the Equal Employment Opportunity Commission (EEOC) and, subsequently, an unsuccessful suit for discriminatory termination in the Eastern District of Missouri, and by two other former employees and two unsuccessful job applicants who claimed to have been subjected to discriminatory treatment.[1] In the petition, the Coalition pointed out that the University's renewal application made no mention of Sullivan's discrimination suit. In its opposition to the Coalition's petition to deny, the University responded that it did not believe disclosure of Sullivan's complaint was required because her discrimination suit resulted in a verdict in the University's favor.

In May 1997 the FCC sent the University a letter asking the University to explain why it had failed to disclose the Sullivan

---

[1]Also appended was the declaration of Sullivan's "friend and companion" purporting to support Sullivan's discrimination claim.

discrimination complaint in its EEO report (Form 396), which the University submitted with its renewal application and which expressly directed the applicant to set out "a brief description of any complaint which has been filed before any body having competent jurisdiction under Federal, State, territorial or local law, alleging unlawful discrimination in the employment practices of the station," JA 30. The letter further directed the University to "identify any other employment discrimination complaint(s) filed against KWMU-FM during the current license term." JA 241. On July 11, 1997 the University submitted an amendment to its EEO report describing the Sullivan litigation.

On September 5, 1997 Rainbow wrote a letter to the FCC alleging the University had deliberately misrepresented its discrimination record by failing to disclose not only Sullivan's complaint and lawsuit but also two other EEOC complaints filed against the University: one by John Schieszer, a former part-time KWMU news reporter who claimed he suffered unlawful retaliation, and one by Tessa Abrams (now Marshall), a black interviewee who claimed the University failed to hire her on account of her race. On October 2, 1997 the University submitted a second amendment acknowledging the unsuccessful EEOC complaint filed by Schieszer but denying any record or knowledge of a complaint by Abrams.[2]

In a decision released January 17, 2001 the FCC denied the Coalition's petition and approved renewal of the KWMU license. With regard to the alleged discrimination, the Commission concluded Rainbow had not established a prima facie case justifying a hearing because its petition did not "contain specific allegations of fact sufficient to show . . . that

---

[2]Abrams acknowledged to the Commission that she did not pursue her complaint beyond its filing with the EEOC and that the EEOC had informed her it had no record of the complaint. 16 F.C.C.R. at 1177 & n.3

a grant of the application would be prima facie inconsistent with" the statute's requirement that "the public interest, convenience, and necessity will be served" by granting a license application. 16 F.C.C.R. at 1175 (citing 47 U.S.C. § 309(d)(1)). The Commission explained that Sullivan's complaint had been finally adjudicated—in the University's favor—and that, with regard to the other alleged discriminatees, consistent with long-standing policy and a Memorandum of Understanding between the FCC and the EEOC, the FCC did not adjudicate their claims but instead referred them first to the EEOC. The Commission advised that, "[i]f the individual allegations of employment discrimination in Rainbow's petition continue to be actionable, the Commission will take cognizance of any final determination of employment discrimination." 16 F.C.C.R. at 1179 (citing *Pac. & So. Co.*, 11 F.C.C.R. 8503, 8505 (1996); *NBC-TV*, 5 F.C.C.R. 2049 (1990); *KSDK, Inc.*, 85 F.C.C. 2d 797 (1981), *reconsideration denied*, 88 F.C.C. 2d 1443 (1992); *Wash. Radio, Inc.*, 88 F.C.C. 2d 1200 (1982)).

With regard to the misrepresentation charge, the FCC found that the University's initial application and the first amendment thereto omitted material facts—respectively, the Sullivan litigation and Schieszer's EEOC complaint[3]—but found "no evidence of an intent to deceive that would support a finding of misrepresentation or lack of candor." 16 F.C.C.R. at 1180. The Commission nonetheless made license renewal subject to an NAL of $8,000 "for willfully omitting material facts in its Form 396 in violation of [47 C.F.R. § 73.1015]." 16 F.C.C.R. at

---

[3]The Commission disregarded the Abrams complaint, noting that "the licensee states that it has not been able to find any record of such a complaint and is not aware of any such complaint" and "Rainbow has no record from the EEOC of such a complaint." 16 F.C.C.R. at 1180.

1181.[4]  Rainbow filed a timely notice of appeal of the decision.

The University moved for reconsideration and in an order released February 17, 2004, the FCC (with two commissioners dissenting) rescinded the NAL because the University's "omissions were not of sufficient gravity to warrant the assessment of a forfeiture under all of the circumstances."  19 F.C.C.R. at 3032.  Rainbow filed a timely notice of appeal of this decision as well.

## II.

This court has directed that "a petitioner whose standing is not selfevident [sic] should establish its standing by the submission of its arguments and any affidavits or other evidence appurtenant thereto at the first appropriate point in the review proceeding"—either "in response to a motion to dismiss for want of standing" or, in the absence of such motion, "with the petitioner's opening brief." *Sierra Club v. EPA,* 292 F.3d 895, 900 (D.C. Cir. 2002).  At this procedural stage, a petitioner "must demonstrate," not merely allege, "that there is a

---

[4]Section 73.1015 provides that "[t]he Commission or its representatives may, in writing, require from any applicant, permittee, or licensee written statements of fact relevant to a determination whether an application should be granted or denied" and that "[a]ny such statements of fact are subject to the provisions of [47 C.F.R.] § 1.17."  Section 1.17, in turn, directs that "no person . . . shall . . . [i]n any written or oral statement of fact, intentionally provide material factual information that is incorrect or intentionally omit material information that is necessary to prevent any material factual statement that is made from being incorrect or misleading" or "[i]n any written statement of fact, provide material factual information that is incorrect or omit material information that is necessary to prevent any material factual statement that is made from being incorrect or misleading without a reasonable basis for believing that any such material factual statement is correct and not misleading."  47 C.F.R. § 1.17(a).

'substantial probability' " it will suffer injury if the court does not grant relief. *Id*. "The petitioner may carry its burden of production by citing any record evidence relevant to its claim of standing and, if necessary, appending to its filing additional affidavits or other evidence sufficient to support its claim." *Id*. at 900-01. Having reviewed the materials the Coalition has submitted, we conclude that it has not met its burden because it has not demonstrated the threshold requirement for associational standing that "at least one of its members would have standing to sue in his own right." *Rainbow/PUSH Coalition v. FCC,* 330 F.3d 539, 542 (D.C. Cir. 2003) (citing *Hunt v. Wash. State Apple Adver. Comm'n,* 432 U.S. 333, 343 (1977)).[5]

To meet this burden the Coalition appended to its opening brief the affidavit of the Reverend Dr. Sammie Earl Jones, a Coalition member who for twenty-five years has resided in St. Louis and been a "regular listener" to KWMU. That Jones is a member of the station's listening audience, however, does not grant "automatic audience standing" to Jones, or through him to the Coalition, to challenge a license renewal even when it is alleged the licensee will operate contrary to the public interest. *Rainbow/PUSH Coalition*, 330 F.3d at 542. Instead, the Coalition must demonstrate that it satisfies each of the three prongs of the well-established test for standing.

"The 'irreducible constitutional minimum of standing contains three elements': (1) injury-in-fact, (2) causation, and (3) redressability." *Id*. (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992)). That is, " ' "to establish standing under Article III, a complainant must allege (1) a personal

---

[5]An association must also demonstrate that "the interest it seeks to protect is germane to its purpose" and that "neither the claim asserted nor the relief requested requires the member to participate in the lawsuit." *Rainbow/PUSH Coalition v. FCC,* 330 F.3d at 542 (citing *Hunt,* 432 U.S. at 343).

8

injury-in-fact that is (2) 'fairly traceable' to the defendant's conduct and (3) redressable by the relief requested." ' " *Microwave Acquisition Corp. v. FCC*, 145 F.3d 1410, 1412 (D.C. Cir. 1998) (quoting *SunCom Mobile & Data, Inc. v. FCC,* 87 F.3d 1386, 1387-88 (D.C. Cir. 1996) (quoting *Branton v. FCC,* 993 F.2d 906, 908 (D.C. Cir. 1993) (quoting *Allen v. Wright,* 468 U.S. 737, 751 (1984))), *cert. denied,* 511 U.S. 1052 (1994)). Further, the injury "must be both 'concrete and particularized' and 'actual or imminent.' " *Id*. (citing *Lujan*, 504 U.S. at 560). The Coalition has not identified an injury that satisfies all of these requirements.

To support its claim of injury, the Coalition first points to portions of Jones's affidavit regarding his role as job counselor with the Coalition. Jones states that the Coalition "undertake[s] to place job applicants with employers and vice versa" and "to train young people and guide their transition into the job market," that he "perform[s] a good deal of this work personally" and that "[i]t is a burden on Rainbow/PUSH's and [his] own time and resources to keep track of which company discriminates and which doesn't, and to have to counsel young people on how to deal with discrimination when they encounter it, how to avoid it, and how to fight it." Jones Aff. ¶ 14.

In *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), the United States Supreme Court established that an organization has constitutional standing to challenge the discriminatory practices of a defendant if those practices adversely affect the activities the person or organization undertakes to fight discrimination. Havens Realty, an organization devoted "to mak[ing] equal opportunity in housing a reality" in the Richmond, Virginia area, sent black "testers" to the defendant real estate company's apartments and the testers were falsely told there were no apartments for rent. 455 U.S. at 368. Because of the real estate company's discriminatory practice of "steering" away black renters, the organization alleged, its

efforts to assist minorities gain equal access to housing "ha[d] been frustrated" and it was required "to devote significant resources to identify and counteract" the discriminatory practices. If proven, the Supreme Court held, this would constitute "concrete and demonstrable injury to the organization's activities—with . . . consequent drain on resources." 455 U.S. at 379; *see also Fair Employment Council of Greater Washington, Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994) (organization that sent testers to employment agency had standing to challenge agency's discriminatory referral practices based on allegations that defendants' practices "interfered with [the organization's community outreach and public education, counseling, and research projects], and [] also required the [organization] Council to expend resources to counteract [defendant's] alleged discrimination," which "closely track[ed] the claims that the Supreme Court found sufficient in *Havens*" (citing *Havens,* 455 U.S. at 379)); *Spann v. Colonial Village, Inc.*, 899 F.2d 24, 28 (D.C. Cir. 1990) (finding two equal housing organizations had standing to challenge realty companies' racially preferential advertising which "discouraged black home buyers and renters from considering defendants' housing and required the organizations to expend additional resources to identify and dispel this discouragement") (citing *Havens,* 455 U.S. at 379).

Neither Jones nor the Coalition has identified such a specific injury directly attributable to the University's alleged discrimination. Jones says only that he finds it burdensome "to keep track of which company discriminates and which doesn't" and "to counsel young people on how to deal with discrimination when they encounter it." Jones Aff. ¶ 14. Unlike the plaintiff in *Havens*, he never says that discrimination *at KWMU* "frustrates" any of his efforts or that he must expend "resources to identify and counteract" *KWMU's* alleged discrimination. Indeed, the portion of Jones's affidavit dealing with counseling never even mentions KWMU. Thus, so far as

we can tell from Jones's affidavit, any discrimination at KWMU would constitute "simply a setback to [his] abstract societal interest,"*Havens*, 455 U.S. at 379, in advancing racial equity.[6]

---

[6]The Coalition also asserts several other "injuries" described in Jones's affidavit but to no more avail. As the Coalition notes, Jones states that he "would like to be able to recruited and considered [sic] fairly for employment at KWMU if positions become available for which [he is] qualified" and would endure "personal indignity" if he suffered discrimination in such event, Jones Aff. ¶¶ 15-16. This contingent injury, however, lacks the necessary imminence to confer standing. *See Animal Defense Fund, Inc. V. Espy,* 23 F.3d 496, 499-500 (1994) (psychobiologist who might one day seek employment that requires laboratory research lacks imminent injury necessary to challenge regulation interpreting laboratory animal protection statute). Jones also states he suffered injury as a "taxpayer" whose taxes "are used to subsidize race discrimination," Jones Aff. ¶ 21, but he has not identified the "logical link" between his taxpayer status and the challenged actions that is required to claim taxpayer standing. *See Flast v. Cohen*, 392 U.S. 83, 102-03 (1968). Jones further asserts he is injured in that the FCC's failure to sanction the University for its discrimination omissions gives "minority residents in the St. Louis Area" the impression neither the University nor the FCC considers discrimination a "serious" matter, Jones Aff. ¶ 22. This basis too is insufficient because the "stigmatizing," "noneconomic" injury caused by racial discrimination "accords a basis for standing only to 'those persons who are personally denied equal treatment,' " *Allen v. Wright*, 468 U.S. 737, 755 (1984) (quoting *Heckler v. Mathews*, 465 U.S. 728, 739-740 (1984)). Finally, Jones asserts that the FCC's failure to address the discrimination "creates a huge disincentive . . . to petition the FCC for redress of grievances in the future" and "diminishes [the] ability to persuade the next generation of leaders that it is worth their time to engage in the moral charge of petitioning their government, or other major institutions in society, for redress of grievances," Jones Aff. ¶ 28. Again, Jones does not explain how this generalized complaint constitutes a concrete injury to him. *See KERM, Inc. v. FCC*, 353 F.3d 57, 61 (D.C. Cir. 2004) (complainant "cannot establish

11

It is true that elsewhere in the affidavit Jones alleges that KWMU is "one of the benchmark institutions in the community," Jones Aff. ¶ 8, and the counseling paragraph claims that "[i]f major institutions, . . . like public radio stations, were to stop discriminating overnight, an enormous burden . . . would be lifted from [his] shoulders," *id*. ¶ 14. Yet Jones never explains how an end to discrimination at this particular "benchmark institution[]" would perceptibly affect his activities. Nor do the affidavits of alleged victims of discrimination at KWMU help the Coalition as nothing in the record links the affiants' experiences with KWMU to Jones's counseling efforts.

Contrary to what the dissent says, *see* Dissent at 5, we do not suggest that an affidavit must contain any "magic words" to support an assertion of standing by the affiant's organization. Jones's affidavit falls short not because the discussion of job counseling omits the name "KWMU" but because, contrary to the law of this circuit, the affidavit never even states, let alone explains how, the alleged discrimination by KWMU in particular affects Jones's counseling and outreach efforts, reducing their effectiveness or requiring Jones to take concrete action in response. *See Fair Employment Council*, 28 F.3d at 1277 (noting that as case moved beyond pleading stage, plaintiff, to show standing, needed to offer "support for [its] claim that [defendant's] alleged discrimination has 'perceptibly impaired' [its] programs"); *Spann*, 899 F.2d at 30 (noting that as case moved forward, plaintiffs would have to prove that [defendant's] violation caused them to expend resources or suffer some other concrete injury"); *Am. Legal Found. v. FCC*, 808 F.2d 84, 92 (D.C. Cir. 1987) (dismissing petition to review FCC order for lack of standing because court was "unable to discern" how non-enforcement of FCC rule caused harm to "any

standing simply by asserting a role as public ombudsman") (citing *Sierra Club v. Morton,* 405 U.S. 727, 736-38 (1972)).

discrete activities [petitioner] might undertake"). An affidavit presented at this procedural stage would have to demonstrate that KWMU's alleged discrimination has such an impact. *See supra* p. 6-7.

Alternatively, the Coalition points to our decision in *Llerandi v. FCC*, 863 F.2d 79 (D.C. Cir. 1988), in which we upheld the standing of the appellants, as "listeners," to challenge the assignment of two radio licenses on the ground that the assignments violated the Commission's then "duopoly" rule, which prohibited common ownership of two AM stations with overly overlapping signals. 863 F.2d at 85. As we explained in *Rainbow/PUSH Coalition*, the *Llerandi* appellants had standing because they were "seeking to take advantage of a prophylaxis the Commission had designed to protect listeners from the possibility that programming would be degraded by the creation of a duopoly." 330 F.3d at 545. The Coalition claims similar standing because it is "seeking to take advantage of a prophylaxis that the Commission had designed to protect residents of the service area and listeners of the station from the possibility that a licensee that practiced intentional racial discrimination in its employment decisions, which calls into question its character qualifications[,] would have its license renewed." Reply Br. 9. This argument overlooks a cardinal distinction between the duopoly rule and the EEO rule. As the court in *Llerandi* explained, the "ultimate point" of the duopoly rule was "to assure (or at least enhance) diversification of viewpoints within the broadcast industry." *Llerandi*, 863 F.3d at 85. Thus, this court had little difficulty finding that a listener, who would be directly affected by the programming diversity the rule was designed to promote, had standing to challenge the Commission's alleged violation of the rule. By contrast, the violation alleged here involves a rule which was not designed to affect a station's programming. The Coalition apparently seeks to revive its theory, which we rejected in *Rainbow/PUSH Coalition,* that a listener has public interest standing to challenge

the license of a broadcaster that breaks FCC rules–any FCC rules regardless whether their violation affects the programming that listeners hear. *See Rainbow/PUSH Coalition*, 333 F.3d at 544-45. As we responded then, while it may be desirable for the Commission to vigorously enforce licensee compliance with its rules, "it does not follow . . . that the audience is harmed whenever the Commission punishes a particular [violation] with less than the ultimate sanction." 333 F.3d at 545; *see also KERM, Inc. v. FCC*, 353 F.3d 57, 61 (D.C. Cir. 2004) (complainant "cannot establish standing simply by asserting a role as public ombudsman" but must assert "injury that is sufficiently unique as to distinguish [complainant] from any other public-minded potential litigant interested in ensuring the faithful enforcement of the Act") (citing *Sierra Club v. Morton,* 405 U.S. 727, 736-38 (1972); *Steel Co. v. Citizens for Better Env't,* 523 U.S. 83, 107 (1998)). Now, as then, the Coalition has failed to "establish an 'actual or imminent' effect upon programming" to support its claim of listener standing. *Id.* (citing *Sierra Club*, 292 F.3d at 899).

Finally, the Coalition relies on our decision in *Office of Communication of United Church of Christ v. FCC,* 359 F.2d 994 (D.C. Cir. 1966), to claim listener standing to challenge discriminatory programming based on "the self evident impact on program service stemming from intentional race discrimination in employment." Reply Br. 10; *see also* Jones Aff. ¶ 9; (complaining of being deprived "of program service in the public interest," including "the multitude of viewpoints held by people of color"). As we explained in *Rainbow/PUSH Coalition*, however, such standing requires a showing that the challenged FCC action "resulted in some actual effect upon the programming" of the licensed station; otherwise "fears of decreased diversity remain purely speculative." 330 F.3d at 545. In *UCC* the appellants made such a showing, proffering a particularized complaint of the sparse and "disrespectful" television exposure accorded blacks " 'accompanied by a

detailed presentation of the results of Appellants' monitoring of a typical week's programming.' " 330 F.3d at 543 (quoting *UCC*, 359 F.2d at 998 n.4). The Coalition has not made a comparable showing here. This is not to say that discriminatory employment practices cannot in some instances affect programming content and thus cause injury to audience members but to establish standing on this basis a complainant must demonstrate both the existence of injury to the audience and its causal link to the discrimination. The Coalition has not done so.

Because the Coalition has failed to demonstrate actual and redressable injury caused by the challenged license renewal so as to establish Article III standing, we dismiss its appeals from the Commission's decisions.

*So ordered.*

ROGERS, *Circuit Judge*, dissenting:   In concluding that the Rainbow/PUSH Coalition fails to demonstrate standing under Article III of the U.S. Constitution, the court applies a heightened evidentiary standard for causation and redressability that precedent does not require.   According to the court, Rev. Jones's affidavit is insufficient to establish constitutional standing because it fails to explain how the burden on his resources is "directly attributable to the University's alleged discrimination" or how "an end to discrimination at this particular 'benchmark institution[]' would perceptibly affect his activities."   Op. at 9, 11.   Under Supreme Court precedent and our own case law, Rev. Jones's affidavit alleges all of the facts necessary to establish constitutional standing.

In *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), the Supreme Court held that an organizational plaintiff suffers an injury caused by a defendant's discriminatory practices when it devotes counseling and referral resources to identifying and counteracting such discrimination.   *Id.* at 379.   Such "concrete and demonstrable injury to the organization's activities — with the consequent drain on the organization's resources — constitutes far more than simply a setback to the organization's abstract social interests."   *Id.*   Relying on *Havens*, this court has held that "an organization establishes Article III injury if it alleges that purportedly illegal action increases the resources the group must devote to programs independent of its suit challenging the action."   *Spann v. Colonial Village, Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990); *see also Fair Employment Council, Inc. v. BMC Marketing Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994).   Under this precedent, Rev. Jones's affidavit sufficiently establishes that the burden on his resources is traceable to the Commission's unconditional renewal of the University's radio station license.

The facts alleged in Rev. Jones's affidavit must be "taken to be true." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *see Sierra Club v. EPA*, 292 F.3d 895, 899 (D.C. Cir. 2002). Rev. Jones describes the University's radio station KWMU-FM as "one of the benchmark institutions in the community," as it is "one of only two secular, noncommercial full power radio stations in [the] community." Jones Aff. ¶ 8. He alleges that KWMU-FM discriminates against minority job applicants in the St. Louis area, and that such discrimination is "particularly egregious" because the University is a public educational institution. *Id.* ¶ 4. He states that Rainbow/PUSH "seeks to ensure that all Americans have equal opportunities to work in industries, such as broadcasting, that are essential to democracy," and that "[t]oward this end, Rainbow/PUSH counsels job applicants and employers on the subject of equal employment opportunity, and . . . undertake[s] to place job applicants . . . and guide their transition into the job market." *Id.* ¶ 14.

More particularly, Rev. Jones explains that he personally devotes significant resources to identifying employers that discriminate against racial minorities so as to "avoid sending young people off to search for employment at work sites where they will either waste their timing filing applications doomed to be discarded on the basis of race, or be hired and face the frustration of a career where they can never fulfill their full potential because of discrimination based on race." *Id.* He also states that he devotes significant resources to counteracting employment discrimination in the St. Louis area by "counsel[ing] young people on how to deal with discrimination when they encounter it, how to avoid it, and how to fight it." *Id.* These burdens on Rainbow/PUSH's and Rev. Jones's resources are traceable to the Commission's unconditional renewal of the University's radio station license because, Rev. Jones explains, "[b]y renewing the University's license [for KWMU-FM] for

another 8 years without so much as a hearing, the FCC extended, rather than provided relief from, the station's ability to continue the alleged pattern of discriminatory employment practices." *Id.* ¶ 5. Such discrimination may, as this court explained in *Fair Employment Council*, "increase the number of people in need of counseling" or "reduce[] the effectiveness of any given level of outreach efforts." 28 F.3d at 1276. Rev. Jones concludes that "[i]f major institutions . . . that provide leadership roles in society as a whole *like public radio stations*" would stop discriminating, the burden on his counseling and referral resources "would be lifted from [his] shoulders." Jones Aff. ¶ 14 (emphasis added).

Counsel for the Commission observed at oral argument that Rev. Jones's affidavit would have been "stronger" if it had identified a specific instance in which KWMU-FM had denied employment to an applicant whom Rev. Jones had referred or counseled. But counsel did not argue, and indeed could not argue, that the failure to do so rendered Rev. Jones's affidavit insufficient as a matter of law. Neither Supreme Court nor our precedent requires the organization to identify a specific instance in which the defendant discriminated against an individual whom the organization referred or counseled; an allegation that the organization expended resources to combat such discrimination is sufficient. *See Havens*, 455 U.S. at 379; *Fair Employment Council*, 28 F.3d at 1276; *Spann*, 899 F.2d at 27-28. Although in *Havens* and *Fair Employment Council* there was evidence that the defendant had discriminated against the organization's testers, such evidence was unnecessary to establish standing because the resources devoted to testing did not form the basis of the organization's injury. *See Havens*, 455 U.S. at 379; *Fair Employment Council*, 28 F.3d at 1276-77. Indeed, in *Spann*, this court found standing without evidence of the defendant's discrimination against the organization's testers, relying instead on the organization's allegation that the

"defendants' preferential advertising tended to steer black home buyers and renters away from the advertised complexes and thus impelled the organizations to devote resources to checking or neutralizing the ads' adverse impact." 899 F.2d at 27.

To the extent that precedent can be read to require the organization to identify the particular burden that the defendant's discrimination, as opposed to general societal discrimination, places on the organization's resources, *see Havens*, 455 U.S. at 379; *Fair Employment Council*, 28 F.3d at 1276; *Spann*, 899 F.2d at 27-28, Rev. Jones's affidavit is sufficient when read in the light most favorable to him and particularly when read in conjunction with the other affidavits proffered by Rainbow/PUSH alleging employment discrimination by KWMU-FM. *Cf. Sierra Club*, 292 F.3d at 899; *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 255 (1986)). Rev. Jones identifies KWMU-FM as "one of the benchmark institutions in the community" and emphasizes that "[i]t is important for the Court to appreciate the vital and unique importance of radio station KWMU-FM in our community." Jones Aff. ¶ 8. He explains that the station has a "unique role to play in fostering racial dialogue in St. Louis" because the University is a public educational institution, *id.*, which makes the station's employment discrimination "particularly egregious," *id.* ¶ 4. He specifies that he seeks to place minority job applicants in the broadcasting industry, and that if "major institutions" with "leadership roles in society as a whole *like public radio stations*" would stop discriminating, a significant burden on his counseling and referral resources would be alleviated. *Id.* ¶ 14 (emphasis added). While other "major institutions" that engage in employment discrimination may also burden his resources, Rev. Jones's affidavit sufficiently identifies KWMU-FM as one of those "major institutions" whose discriminatory employment practices burden his

resources. Such practices are documented by the specific facts alleged in the several affidavits of minority job applicants and employees that describe the station's discrimination against them. *Cf. Rainbow/PUSH Coalition v. FCC*, 330 F.3d 539, 544 (D.C. Cir. 2003).

According to the court, Op. at 9, Rev. Jones's affidavit is insufficient because it fails to mention KWMU-FM by name in paragraph 14 when referring to discrimination by "major institutions . . . that provide leadership roles in society as a whole *like public radio stations*," even though the entire affidavit refers to KWMU-FM, and paragraphs 4 and 8 specifically describe KWMU-FM as one of the only two secular public radio stations in the St. Louis community and as a benchmark institution that engages in "particularly egregious" employment discrimination. Jones Aff. ¶¶ 4, 8. Nothing in our precedent requires the affidavit to state "magic words" in the way that the court requires today. Rather than confront the content of Rev. Jones's affidavit and accord him all reasonable inferences, the court simply asserts that he fails to explain how KWMU-FM's alleged discriminatory employment practices burden his counseling and referral resources. Op. at 11. Taken together with the affidavits submitted by Rainbow/PUSH and read as a whole in the light most favorable to Rainbow/PUSH, Rev. Jones's affidavit sufficiently connects, for the purpose of demonstrating constitutional standing, KWMU-FM's discriminatory employment practices to the burden on his counseling and referral resources.

Rev. Jones's affidavit also adequately demonstrates that his injury is redressible. A "violation of the procedural requirements of a statute," such as the Commission's failure to conduct a hearing pursuant to 47 U.S.C. § 309(e), "is sufficient to grant a plaintiff standing to sue, so long as the procedural requirement was 'designed to protect some threatened concrete

interest' of the plaintiff." *City of Waukesha v. EPA*, 320 F.3d 228, 234 (D.C. Cir. 2003) (quoting *Defenders of Wildlife*, 504 U.S. at 573 n.8). This requirement "is not very stringent" and requires only "some sort of connection between the procedural requirement at issue and the substantive action of the agency." *Id.* at 234-35. Here, the statute itself establishes the connection between the procedural requirement of an evidentiary hearing and the substantive action of conditioning or denying the license renewal. *See* 47 U.S.C. § 309 (2000). Thus, for the purpose of evaluating redressibility, the court must assume that Rainbow/PUSH will succeed on the merits and obtain the remedies it seeks, *see City of Waukesha*, 320 F.3d at 235, such as a denial of the license renewal or a renewal conditioned on nondiscriminatory employment practices.

By applying a heightened evidentiary standard for causation and redressibility, the court betrays a fundamental misconception about the purpose of the standing requirement. At this stage of the proceeding, the issue is not likelihood of success on the merits. Rather, the standing requirement simply ensures that the petitioner has a "defined and personal stake in the outcome of the litigation" and that the court does not render an advisory opinion. *Florida Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) (en banc). For example, in *Havens*, the Supreme Court accepted for the purpose of establishing standing the organization's allegation that it had expended resources to combat the defendant's discrimination, while noting that the organization would "have to demonstrate at trial that it has indeed suffered impairment in its role of facilitating open housing before it will be entitled to judicial relief." 455 U.S. at 379 & n.21; *see also Fair Employment Council*, 28 F.3d at 1277. Indeed, to require evidence beyond the specific facts alleged in Rev. Jones's affidavit "is to raise the standing hurdle higher than the necessary showing for success on the merits" in a petition seeking an evidentiary hearing on KWMU-FM's alleged

employment discrimination. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 181 (2000).

The Supreme Court has observed that "in many cases the standing question can be answered chiefly by comparing the allegations of the particular complaint to those made in prior standing cases." *Spann*, 899 F.2d at 29 (quoting *Allen v. Wright*, 468 U.S. 737, 751-52 (1984)) (internal quotation marks omitted). To the extent that this court requires a heightened evidentiary showing to establish standing, it departs from the Supreme Court's approach. For example, in *Friends of the Earth*, the Supreme Court held that a plaintiff's affidavit alleging that he intended to fish in a river allegedly polluted by the defendant was sufficient to establish standing, even though the plaintiff did not provide evidence showing that the specific site where he intended to fish was polluted by specific toxins discharged by the defendant. 528 U.S. at 181-82. It was sufficient that the plaintiff identified the river, stated that he wanted to fish in the river but was deterred by pollution there, and alleged that the defendant polluted the river. Similarly, it is sufficient that Rev. Jones identified the St. Louis broadcasting job market, stated that he wanted to counsel and place minority job applicants in that market but was burdened by the "pollution" of discrimination by major institutions, and alleged that KWMU-FM was a major "polluter."

Accordingly, I would hold that Rainbow/PUSH has demonstrated its Article III standing to challenge the Commission's denial of its request for a hearing on the University's application for renewal of KWMU-FM's license.

Upon reaching the merits, I would deny the petition. First, the Commission has "broad discretion in determining whether to hold a hearing in conjunction with a license renewal," and this court defers to the Commission's decision not to hold a hearing

if it is "reasonable and supported by the evidence before it." *Beaumont Branch of the NAACP v. FCC*, 854 F.2d 501, 507 (D.C. Cir. 1977). For the reasons stated by the Commission, *see Curators of the Univ. of Missouri*, 16 F.C.C.R. 1174, 1176-78 (2001), it could reasonably conclude that the affidavits submitted by Rainbow/PUSH did not constitute strong enough evidence to justify departure from the Commission's "longstanding general policy" of referring such allegations of employment discrimination to the Equal Employment Opportunity Commission. *Id.* at 1178; *see Tallahassee Branch of the NAACP v. FCC*, 870 F.2d 704, 710 (D.C. Cir. 1989). Second, it was reasonable for the Commission to conclude that it was unnecessary to conduct a hearing on the University's failure to include in its license renewal application all employment discrimination complaints filed against it. Rainbow/PUSH's allegations are not necessarily inconsistent with the Commission's finding that the University did not intend to deceive the Commission. *See Citizens for Jazz on WRVR, Inc. v. FCC*, 775 F.2d 392, 396 (D.C. Cir. 1985); *Fox Television Stations, Inc.*, 10 F.C.C.R. 8452, 8487 (1995). This finding is supported by both the University's statement that the omissions were inadvertent, which the Commission was entitled to credit, and the fact that the omitted complaints were resolved in the University's favor. *See Curators*, 16 F.C.C.R. at 1179-81.